Erin E. Byrnes, No. 021015
Lisa S. Wahlin, No. 013979
GRAIF BARRETT & MATURA, P.C.
1850 North Central Avenue, Suite 500
Phoenix, Arizona 85004
Telephone: (602) 792-1700
Facsimile: (602) 792-1710
ebyrnes@gbmlawpc.com
lwahlin@gbmlawpc.com

Attorneys for Plaintiff Town of Colorado City

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| TOWN OF COLORADO CITY, an Arizona municipality,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED EFFORT PLAN TRUST, (Dated November 9, 1942, Amended April 10, 1946, and Amended and Restated on November 3, 1998); and BRUCE WISAN, Special Fiduciary,<br><br>Defendants. | **COMPLAINT FOR DECLARATORY RELIEF** |

Plaintiff Town of Colorado City ("Colorado City") for its Complaint against Defendants the United Effort Plan Trust and Bruce Wisan, Special Fiduciary for the Trust, states and alleges as follows:

### PARTIES

1.      Plaintiff Colorado City is an Arizona municipal government.

2.      Defendant the United Effort Plan Trust (hereinafter "the UEP Trust") is a religious and charitable trust formed in 1942 according to the laws of the State of Utah.

3.      Defendant Bruce Wisan is a Utah resident and, at all times relevant hereto, was the court-appointed Special Fiduciary of the UEP Trust.  In that capacity, Bruce Wisan purports to oversee and administer the Trust's assets, including much of the real property located in Colorado City, Arizona.

**JURISDICTION AND VENUE**

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1).

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(2).

**GENERAL ALLEGATIONS**

**(a)      The Underlying Lawsuit (the "Cooke Lawsuit"):**

6.      This case arises out of claims alleged in a lawsuit filed by Ronald and Jinjer Cooke in this Court – Case No. 3:10-cv-08105-JAT – against Colorado City, the City of Hildale, Utah (collectively referred to herein as "the Twin Cities") and several other defendants.  The "Cooke Lawsuit" alleges that Colorado City and the other defendants discriminated against the Cookes by denying them a culinary water connection on the basis of the Cookes' religion and Mr. Cooke's disability.

7.      According to the Cooke Lawsuit, Mr. Cooke was raised in the Twin Cities area.  He is a former member of the Fundamentalist Church of Jesus Christ of Latter-Day Saints ("FLDS"), but left the FLDS in his late teens.

8.      Mr. Cooke claims that after he left the FLDS, he moved to the Phoenix area.  While living in Phoenix, Mr. Cooke was reportedly in a very serious accident that rendered him permanently disabled.

9.      Sometime in late 2007 or early 2008, Ronald and Jinjer Cooke decided to return to Colorado City from Phoenix, Arizona.

10.     As a former FLDS adherent, Mr. Cooke believes himself to be a beneficiary of the UEP Trust.  Consequently, on or about February 11, 2008, Ronald Cooke submitted a Petition for Benefits to the UEP Trust.

11.     This application was approved the same day it was submitted.

12.     In submitting the Petition for Benefits, Mr. Cooke was essentially responding to offers from the UEP – made by and through Seth Cooke, who was both Ronald Cooke's brother and a member of the UEP Advisory Board – for housing.  Indeed,

1  Ronald Cooke's belief that the UEP would provide him with affordable housing was his

2  primary impetus for returning to the area.

3          13.     Mr. Cooke, and/or someone on his behalf, coordinated with the UEP Trust

4  to identify a property to be occupied by the Cooke family.  Mr. Cooke claims he was

5  seeking "suitable, affordable housing."

6          14.     According to the Cooke Lawsuit, suitable housing was housing with

7  existing culinary water to assist in caring for Mr. Cooke's disability, as well as "reliable

8  electricity" to run the medical device he alleges he needs to assist his breathing at night.

9          15.     In spite of the fact that the UEP Trust and/or Special Fiduciary Wisan knew

10  of Mr. Cooke's needs, and though there were other unoccupied properties in Colorado

11  City at the time the Cookes sought housing, the UEP Trust and/or the Special Fiduciary

12  nevertheless elected to assign the Cookes the property at 420 East Academy (hereinafter

13  the "Subject Property") for residential occupancy.

14          16.     On February 11, 2008, the same date that Mr. Cooke submitted his Petition

15  for Benefits to the UEP Trust, the Special Fiduciary issued the Cookes an Occupancy

16  Agreement for the Subject Property.

17          17.     The Subject Property never had an existing culinary water connection.

18          18.     At all times relevant to the Cooke Lawsuit, the Twin Cities' Utility Board

19  had a uniformly applied, non-discriminatory policy in place providing that no new service

20  locations would be connected to the culinary water system unless the applicant is able to

21  adequately bring water to the system.

22          19.     The policy developed after the Twin Cities experienced several summers

23  during which there was a critically high demand for water, culminating in an emergency

24  water shortage in the summer of 2007.

25          20.     Though the UEP Trust's Advisory Board and/or Bruce Wisan were well-

26  aware of the Utility Board's policy and the Twin Cities' concerns about water shortages,

27  and though the UEP Trust and/or Mr. Wisan were well-aware of Mr. Cooke's professed

28

3

1  need for culinary water to meet the needs of his disability, Mr. Wisan nevertheless entered

2  an occupancy agreement with Ronald Cooke for the Subject Property.

3      21.    The Cookes moved onto the Subject Property in May 2008.  At that time,

4  the "residence" on the Subject Property consisted only of the partially constructed slab

5  and frame constructed by someone other than the Cookes.  It did not have an existing

6  culinary water connection.

7      22.    On or about April 1, 2008, Seth Cooke contacted the utility department

8  about the availability of utility service, including water, for the Subject Property.  Upon

9  information and belief, Seth Cooke took these actions on behalf of his brother, Ronald

10  Cooke.

11      23.    At all times relevant to this Complaint, Seth Cooke was a member of the

12  UEP Trust Advisory Board, as well as the UEP Trust's Housing Subcommittee.

13      24.    On April 1, 2008, Seth Cooke also met with Colorado City personnel.

14  Colorado City personnel fully explained the water connection policy to Seth Cooke and

15  other agents for Ronald Cooke who were present at that meeting. Colorado City personnel

16  also explained that to apply for utility service, the Cookes would need to complete an

17  application, pay applicable fees, and meet other standard requirements.

18      25.    The Cookes failed to complete their application or comply with other

19  requirements for establishing service.

20      26.    The Cookes never submitted an application to establish a new culinary

21  water service location.  They were unsuccessful in obtaining culinary water service.

22      27.    On or about this same period, the Cookes inquired as to how to apply for a

23  building permit.  Colorado City building officials reviewed the necessary requirements

24  and plan submittal checklists with the Cookes multiple times in 2008, but the Cookes

25  never applied for a building permit.

26      28.    Though the Cookes never applied for or obtained a building permit, they,

27  and/or their agents, including Seth Cooke, nevertheless began construction on the Subject

28  Property in May 2008.

29.     On or about October 24, 2008, approximately five months after moving to the Subject Property, Mr. Cooke delivered a letter addressed to the Colorado City Utility Board and/or Colorado City to Colorado City's Town offices.  The letter advises, *for the first time,* that Mr. Cooke is allegedly disabled and that he needs electrical service for his breathing machine at night.  This letter also asks for culinary water, but does not indicate the request is made in the form of one for reasonable accommodation.

30.     Ronald Cooke delivered a similar letter to the City of Hildale on October 24, 2008.

31.     On December 15, 2008, Hildale's Business Manager responded to Mr. Cooke and again explained that a new water connection could not be provided due to the Utility Board's policy. The Business Manager further explained that the Twin Cities' culinary water system was already overextended and that both municipalities feared that the addition of any new service locations on the already overly taxed system could lead to systemic failure, endangering the public health, safety, and welfare, as had occurred in July of 2007.

32.     On December 23, 2008, Ronald Cooke filed a Housing Discrimination Complaint with the Arizona Civil Rights Division ("ACRD"), alleging that Colorado City, along with other governmental entities including the City of Hildale, discriminated against him on the basis of religion and disability in denying him utilities, including a culinary water connection.

33.     Though the ACRD should have brought the UEP Trust into the case, given that it functions as the landlord on the Subject Property, the ACRD failed to do so.

34.     Upon information and belief, the cost of providing a new water connection to the Cookes may be as high as $150,000.00, since Colorado City would likely have to drill a new well to provide the additional water necessary to meet the demands of this new connection.

35.     In December 2009, the parties and an attorney for the UEP Trust participated in a teleconference to discuss settlement of the housing discrimination

complaint. The UEP Trust participated in these discussions at Colorado City and Hildale's urging.

36.     All settlement efforts were ultimately unsuccessful.

37.     Subsequently, in June 2010, the State of Arizona filed a lawsuit against Colorado City in the Maricopa County Superior Court. The Cookes retained private counsel and filed a corresponding lawsuit, alleging federal claims, in this Court in June 2010. The State has since intervened in the federal action, and the case is now proceeding as a single action in this Court.

**(b)**     **The UEP Trust and Land Ownership in Colorado City, Arizona:**

38.     In 1942, members of the FLDS established the UEP Trust pursuant to Utah law. Originally, the Trust was established as a charitable trust.

39.     According to the tenets of their faith, FLDS members are expected to dedicate their property – personal and real – to the bishop of the Church. FLDS members seek to hold all property in common.

40.     Once property has been consecrated, the bishop grants an "inheritance" or "stewardship" to each family out of the properties held in trust by the FLDS, according to each family's just wants and needs.

41.     The UEP Trust was established expressly for the purpose of facilitating this process by providing a legal mechanism though which FLDS members could consecrate their property to the Church.

42.     Since its inception, then, the UEP Trust has existed to hold and manage all real estate and improvements consecrated by FLDS adherents.

43.     From its establishment until 1998, the UEP Trust was considered a charitable, religious trust. Then, in 1998, the Trust was reformed as a result of the Utah Supreme Court's decision in *Jeffs v. Stubbs*, 970 P.2d 1234 (Utah 1998).

44.     The *Jeffs* court held the UEP Trust was not a charitable trust because it specifically named identifiable beneficiaries. As a result, the Utah court reformed the UEP Trust.

45.     After the *Jeffs* decision was issued, the UEP Trustees executed a Restated Trust Declaration. In restating the UEP Trust's forming documents, the Trustees sought to ensure it maintained its designation as "charitable" and that it would be operated according to the faith.  As such, the UEP Trustees redefined the Trust's beneficiaries to include all FLDS members who "consecrate their lives, times, talents and resources to the building and establishment of the Kingdom of God on Earth under the direction of the President of the Church."

46.     The new definition of "beneficiary" in the 1998 Amended UEP Trust has substantially increased the class of putative Trust beneficiaries.

47.     The 1998 Amended UEP Trust document also provides that "the doctrines and laws of the Priesthood and the Church … are the guiding tenets by which the Trustees of the United Effort Plan Trust Shall Act."  The restatement goes on to provide that the Trust is to be administered "consistent with its religious purpose to provide for Church members, according to their wants and needs, insofar as their wants are just ….:"

**(c)      The UEP Trust Litigation and Unconstitutional State Control of the Trust:**

48.     On May 26, 2005, the Utah Attorney General ("Utah AG") brought an action for breach of trust against the UEP Trustees (hereinafter the "Trust Litigation") in the Fifth Judicial District Court for the State of Utah.  The case is captioned *In the Matter of the United Effort Plan Trust (Dated November 9, 1942, Amended April 10, 1946, and Amended and Restated on November 3, 1998)*, Case No. 053900848.

49.     This action was brought as a probate action, pursuant to Utah's Uniform Trust Code, and sought "an immediate order suspending the authority and power of the current trustees pending a final decision of the Court on their removal and appointing an interim special fiduciary *for the limited purpose of preserving the assets of the trust ….*" *In the Matter of the United Effort Plan Trust*, Case No. 053900848, Utah Attorney General's Petition at 2.

50.     On May 27, 2005, the Court granted the Utah AG's *ex parte* motion for entry of a temporary restraining order ("TRO"). Pursuant to the TRO, the existing Trustees of the Restated Trust were removed.

51.     In the same order, the Utah court appointed Bruce Wisan to act as the UEP's Special Fiduciary.  A copy of the order is attached at Exhibit A. The Order did not specifically identify the powers the Special Fiduciary would wield.

52.     On September 2, 2005, Judge Denise Lindberg, the judge hearing the Trust Litigation, entered an Order expanding the Special Fiduciary's powers.  A copy of that Order is attached at Exhibit B.  According to this order, Mr. Wisan is vested with the authority to, amongst other things, "file lawsuits to recover or protect Trust property as such action is deemed reasonable, prudent, and/or necessary in the discretion of the Fiduciary" and to "manage, lease, or rent the property of the Trust as such action is deemed reasonable, prudent, and/or necessary in the discretion of the Fiduciary …."

53.     In this same Order, Judge Lindberg solicited input from the parties on methods for appointing new trustees for the UEP Trust.

54.     Over the next several months, various proposals were submitted to the Court related to appointing new trustees and reformation of the Trust.  Each of these proposals was submitted by persons suing the Trust, many of whom were former FLDS members.

55.     After receiving these proposals, Judge Lindberg issued a memorandum decision on December 13, 2005, in which she sought to reform the UEP Trust pursuant to the Utah Uniform Trust Code. Though Judge Lindberg recognized that the 1998 amendment document was controlling, she nevertheless went on to hold that the constitution forbade her from reforming the Trust on the basis of religious doctrine. Consequently, she sought to apply "neutral principles of law" in reforming the UEP Trust.

56.     More particularly, Judge Lindberg indicated that the 1998 Trust document contained both secular and non-secular portions and declared her intent in reforming the Trust to "create a clear division between the two."

57.     In this same order, Judge Lindberg allowed the Arizona Attorney General ("AzAG") to intervene in the Trust Litigation, stating that AzAG's intervention and involvement, alongside the Utah AG, was appropriate because "the AGs are the community's representatives for ensuring that the charitable purposes of the Trust are protected."

58.     On October 25, 2006, Judge Lindberg created the Reformed Trust, and simultaneously expanded the Special Fiduciary powers.

59.     Based on his new authority, Bruce Wisan was encouraged to continue to pursue his strategy for subdividing Trust property to convey it to beneficiaries of the Trust in a religiously neutral way.

60.     More importantly, Mr. Wisan essentially became the party responsible for identifying beneficiaries of the UEP Trust, as well as determining their "just wants and needs." The term "just wants and needs" is defined by FLDS scripture and therefore any determination of such just wants and needs necessarily must be made according to religious principles.

61.     As the Special Fiduciary, Bruce Wisan's extensive authority requires him to meet the just wants and needs of Trust beneficiaries by, amongst other things, identifying and providing homes to UEP Trust beneficiaries. He is assisted in this work by the Advisory Board and its Housing Subcommittee. At all times relevant to this matter, Seth Cooke, Ronald Cooke's brother, sat on both the Advisory Board and the Housing Subcommittee.

62.     On October 6, 2008, the FLDS filed a lawsuit ("FLDS Lawsuit") against Bruce Wisan, the Utah and Arizona AGs and Judge Lindberg, arguing that the Utah state court's reformation of the UEP Trust and subsequent administration of the UEP Trust vis-à-vis the Special Fiduciary violated their First Amendment rights. That case is captioned *The Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Bruce R. Wisan, et al.*, Case No. 2:08-cv-772.

9

63.     The FLDS Lawsuit claims, amongst other things, that the manner in which Bruce Wisan, Utah and Arizona have administered the UEP Trust since its state-authorized takeover in 2006, is contrary to the UEP Trust's express religious purposes and therefore is unconstitutional.

64.     The FLDS Lawsuit notes that according to the 1998 Trust document, continued enjoyment of UEP Trust participation and benefits is intended to be conditioned on a beneficiary's living in accordance with the tenets of the faith.  By divorcing the UEP Trust's operation from its religious underpinnings, the Utah state court violated the Establishment and Free Exercise Clauses of the United States Constitution.

65.     On February 24, 2011, Judge Dee Benson of the Utah federal district court issued a Memorandum Opinion and Order granting a preliminary injunction which extends the terms of a previously entered TRO.  A copy of Judge Benson's decision is attached at Exhibit C.

66.     Judge Benson's February 24, 2011 decision holds that Judge Lindberg's action in reforming the Trust so as to require it be administered pursuant to neutral, non-secular principles violated the Establishment Clause by inhibiting religion and by fostering excessive government entanglement with religion.  *See* Exhibit C at 16-17.

67.     Indeed, the Utah federal district court goes on to state that the "state actors had no authority to act as they did," referring to not only the reformation of the Trust, but also to the appointment of Bruce Wisan as Special Fiduciary, and to defining the scope of Mr. Wisan's authority as requiring him to administer the Trust consistent with neutral legal principles.  *See id.* at 24-25.

68.     Judge Benson's decision also finds that while the parties did not focus their arguments as heavily on the Free Exercise Clause, it was likely that, on the record as developed at the time of the decision, the FLDS plaintiffs would succeed on this claim as well.  *Id.* at 27.

/ / /

/ / /

**(d)**      <u>The Special Fiduciary's Land Reassignment and Subdivision Efforts:</u>

69.      Upon information and belief, at the time the Trust Litigation was initiated, approximately 90 – 95% of all real property in Colorado City was owned and controlled by the UEP Trust.

70.      Prior to Bruce Wisan's appointment as Special Fiduciary, FLDS members lived on land consecrated by their ancestors. Changes in the families occupying any particular parcel within Colorado City were relatively infrequent.

71.      This began to change significantly after Mr. Wisan, who is not an FLDS member or adherent, began to exercise his court-authorized powers.

72.      Mr. Wisan has reassigned property from those FLDS members currently occupying property to non-FLDS persons who allegedly are UEP Trust beneficiaries.

73.      More often than not, Mr. Wisan undertakes these reassignments without following the proper procedure for doing so. Specifically, upon information and belief, neither the UEP Trust nor Mr. Wisan, on the Trust's behalf, has ever filed a forcible detainer action in Arizona against an existing occupant of any residential property to extinguish the existing resident's rights, prior to reassigning the property.

74.      This is in contravention to Arizona law and has resulted in, and continues to cause, frequent and ongoing civil property disputes within Colorado City between competing interested parties. Colorado City authorities are often called to respond to these disputes, though they are essentially civil property disputes.

75.      Mr. Wisan's property reassignments are part of a greater effort to force individual property ownership onto a community comprised of almost exclusively FLDS members.

76.      One way in which Mr. Wisan has sought to privatize land ownership in Colorado City is by subdividing UEP Trust property into individual parcels that can be sold to individual owners.

77.      Mr. Wisan's efforts to subdivide land in the community began almost immediately upon his appointment and were in full swing by 2007.

78.     Mr. Wisan's efforts, including those to privatize most of Colorado City, are supported and augmented by both the Utah and Arizona AGs, both of whom have been more active in the UEP Trust Litigation than has the Special Fiduciary himself.  Indeed, at times, the positions taken by the AGs' offices appear to be *on behalf of* Mr. Wisan in his position as Fiduciary, rather than in either office's representative capacity on behalf of putative UEP Trust beneficiaries.

79.     Furthermore, the Utah state court ratifies Mr. Wisan's subdivision efforts, though they are often taken lawlessly.

80.     As part of its efforts to subdivide and privatize real property in Colorado City, the UEP Trust has sought to have Colorado City and its sister city, Hildale, Utah (the "Twin Cities"), extend new water service to proposed subdivision lots.

81.     The UEP Trust and/or Mr. Wisan have sought these new water connections despite being aware of the water shortage of 2007 and the resultant uniform policy restricting such new connections.

82.     Further, the UEP Trust and the Special Fiduciary have indicated a complete unwillingness to bear any cost associated with the extension of City infrastructure to these properties, especially as those costs might relate to culinary water service.  Rather, the UEP Trust, through Mr. Wisan, advised Colorado City that it should bear the costs.

83.     When Colorado City rejected this notion, the Special Fiduciary made oblique threats about "ways to get around" the problem.  Colorado City did not become aware until later that Mr. Wisan's decision to place the Cooke family on the Subject Property was likely part of the UEP's overarching goal to privatize the land, and force Colorado City to bear the cost of providing the culinary water-related infrastructure.

**(e)     Robert Black and the Competing Interests in the Subject Property:**

84.     Prior to 2007, pursuant to authority granted by the UEP Trust, Robert Black inhabited the Subject Property.  Mr. Black is believed to be an FLDS member.

85.     In 2001, Mr. Black obtained a building permit from Colorado City to begin constructing a home on the Subject Property.  After obtaining the building permit, Mr. Black put in the slab on the Subject Property and framed the house.

86.     Given the unusual form of land ownership common to Colorado City, most properties are not covered by residential mortgages and obtaining construction loans is all but impossible.  Consequently, residential construction occurs over an extended period of time – residents build as the resources are available to do so.  Oftentimes, this means that a home can take several years to build from the start of construction to move-in.

87.     Upon information and belief, Mr. Black ceased construction work on the Subject Property.  The precise date upon which Mr. Black ceased his work at the Subject Property is unknown at this time.

88.     The UEP Trust and/or Bruce Wisan subsequently declared that Mr. Black had abandoned the Subject Property, yet neither the UEP Trust nor Mr. Wisan took any action to extinguish Mr. Black's right to occupy the property, as required by Arizona law.

89.     Instead, the UEP Trust and Mr. Wisan went forward and assigned the Cookes to the Subject Property, even though Mr. Black's rights had not been extinguished.  Upon information and belief, this "reassignment" of the Subject Property from an FLDS member to a non-FLDS UEP Trust beneficiary was intended to serve the UEP Trust's overarching efforts to move the entire Twin Cities community towards private land ownership via the creation and sale of subdivided property.

90.     Upon information and belief, Robert Black believes himself to be the rightful occupant of the Subject Property.

91.     In fact, in September 2009, Robert Black showed up to a Utility Board meeting and advised the Board that he intended to continue to assert his rights to the property.

92.     Additionally, on September 14, 2009, Robert Black attended a Colorado City Town Council meeting.  At this meeting, Mr. Black told the Council that he believed he was entitled to inhabit the Subject Property.  Mr. Black's assertion of an ongoing right

1   to occupy the Subject Property caused the City Council great concern, in light of the fact

2   that the Council was being asked, in the context of the Cooke Litigation, to provide a new

3   culinary water connection to the Subject Property.

4        93.    The Council worried that if the Cookes were not legally entitled to occupy

5   the Subject Property, they may not achieve a final settlement of the Cooke Litigation,

6   even if they agreed to establish a new culinary water service location at the Subject

7   Property.

8        94.    In October of 2009, as further evidence of Mr. Black's intent to assert a

9   right to occupy the Subject Property, he inquired about obtaining another building permit

10  for the Subject Property and ultimately applied for one.

## COUNT ONE
### (Declaratory Relief)

11
12       95.    Plaintiff incorporates all facts set forth above as though fully set forth

13  herein.

14
15       96.    Based upon Judge Benson's February 24, 2011 Order, any and all actions

16  Bruce Wisan has taken following Judge Lindberg's reformation of the UEP Trust on

17  December 13, 2005 were unconstitutional because they violated the First Amendment.

18       97.    Consequently, Bruce Wisan lacked any authority to approve Ronald

19  Cooke's February 11, 2008 Petition for Benefits.  That approval is therefore void.

20       98.    Because Ronald Cooke's Petition for Benefits and its subsequent approval

21  are void, he was not eligible to receive Trust benefits, including, but not limited to, an

22  assignment of any UEP Trust owned housing.

23       99.    Therefore, the Occupancy Agreement issued to Ronald Cooke on February

24  11, 2008 for the Subject Property is void and unenforceable.

25       100.   Because the Occupancy Agreement lacks legal force, neither Ronald Cooke

26  nor his family had a legal right to occupy the Subject Property.

## COUNT TWO
### (Declaratory Relief)

27
28       101.   Plaintiff incorporates all facts set forth above, as if fully set forth herein.

14

102.    Colorado City does not know, nor can it determine, who the rightful occupier of the Subject Property was in May 2008.  Moreover, Colorado City does not know who the rightful occupier was from May 2008 to present.  Robert Black claims to be the rightful occupier, as do the Cookes.

103.    Until a determination is made as to which person or persons had/has the lawful right to occupy the Subject Property, Colorado City may find itself required, as part of a remedy to the Cookes' housing discrimination lawsuit, to provide a new water connection to a property which the Cookes may not be lawfully entitled to inhabit.

104.    Colorado City's water shortage policy was enacted in an effort to uniformly ensure there would be sufficient culinary water to serve existing customers.  Providing new water connections where, as here, the property occupiers have not met the existing policy for establishing the new connection, jeopardizes the availability of water in the Twin Cities area for daily and emergency use.

WHEREFORE, the Town of Colorado City requests that this Court provide the following relief:

(a)    A declaration that any and all actions Bruce Wisan took with respect to the Subject Property and/or the Cookes' occupancy of the Subject Property after December 13, 2005 are unconstitutional and therefore void;

(b)    A declaration that Ronald Cooke's Petition for Benefits dated February 11, 2008 is void and unenforceable because it was approved by Bruce Wisan, who lacked any legitimate authority to review and/or grant said Petition.

(c)    A declaration that Ronald Cooke's February 11, 2008 Occupancy Agreement for the Subject Property, and any other subsequent Occupancy Agreement for that property approved by Bruce Wisan, is void and unenforceable.

(d)    A declaration that, at all times relevant to the Cooke Litigation, neither Ronald Cooke nor his family had any legal authority to occupy the Subject Property.

(e)    A declaration as to who had the rightful legal authority to occupy the Subject Property between May 2008 and the present; and

(f)    For such other and further relief as this Court deems just and proper.

15

1       DATED this 11th day of March, 2011.

2                              GRAIF BARRETT & MATURA, P.C.

4                       By /s/ Erin E. Byrnes

5                        Erin E. Byrnes
                            Lisa S. Wahlin

6                        1850 North Central Avenue, Suite 500
                          Phoenix, Arizona  85004

7                        *Attorneys for Town of Colorado City*

10   4831-8549-8888, v.  1