# EXHIBIT 1

Jeffrey C. Matura, State Bar No. 019893
**GRAIF BARRETT & MATURA, P.C.**
1850 North Central Avenue, Suite 500
Phoenix, Arizona 85004
Telephone: (602) 792-1700
Facsimile: (602) 792-1710
jmatura@gbmlawpc.com

Attorneys for Plaintiff Town of Colorado City

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| TOWN OF COLORADO CITY, an Arizona municipality,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED EFFORT PLAN TRUST, (Dated November 9, 1942, Amended April 10, 1946, and Amended and Restated on November 3, 1998); and BRUCE WISAN, Special Fiduciary; RONALD COOKE and JINJER COOKE, husband and wife; ROBERT BLACK and JANE DOE BLACK, husband and wife,<br><br>Defendants. | Case No. 3:11-cv-08037-DGC<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF** |

Plaintiff Town of Colorado City, for its First Amended Complaint against defendants the United Effort Plan Trust, Bruce Wisan, as Special Fiduciary for the United Effort Plan Trust, Ronald Cooke and Jinjer Cooke, and Robert Black and Jane Doe Black, alleges the following:

**PARTIES**

1. Plaintiff Colorado City is an Arizona municipal government.

2. Defendant the United Effort Plan Trust ("the UEP Trust") is a religious and charitable trust formed in 1942 according to the laws of the State of Utah.

3. Defendant Bruce Wisan is a Utah resident and, at all times relevant hereto, was the Court-appointed Special Fiduciary of the UEP Trust. In that capacity, Bruce

Wisan purports to oversee and administer the Trust's assets, including much of the real property located in Colorado City, Arizona.

4. Defendants Ronald Cooke and Jinjer Cooke are husband and wife. Upon information and belief, they are Arizona residents. They are collectively referred to below as "the Cookes."

5. Upon information and belief, defendant Robert Black is an Arizona resident and married to Jane Doe Black. The true name of Jane Doe Black is unknown. If and when Colorado City learns her name, it will move to amend the case caption.

## JURISDICTION AND VENUE

6. Colorado City seeks a declaration from this Court regarding the following two issues: (a) whether Bruce Wisan had the authority under the United States Constitution, and particularly the Establishment and Free Exercise Clauses, to place the Cookes onto the subject property; and (b) whether the Cookes or Robert Black have the right to occupy the subject property.

7. An actual controversy exists because the Cookes and Robert Black have asserted competing interests and claims to the subject property.

8. Upon information and belief, Robert Black is a member of The Fundamentalist Church of Jesus Christ of Latter-Day Saints ("FLDS"). Mr. Black claims that he has the right to occupy the subject property because the UEP Trust (prior to Mr. Wisan's involvement) granted him the authority to occupy the property.

9. The Cookes, who are not FLDS members, claim that they have the right to occupy the subject property because Mr. Wisan, as the Special Fiduciary of the UEP Trust, granted them the authority to occupy the property.

10. The Cookes currently allege, as described in detail below, that Colorado City has discriminated against them with respect to the subject property due, in part, to the their religious beliefs. Robert Black has asserted his contrary rights to the property and could raise a similar religious discrimination claim.

1    11.    If Mr. Wisan's conduct was unconstitutional, then the Cookes may not have any right to occupy the property; rather, Robert Black may have a right. If Mr. Wisan's conduct was constitutional, then Robert Black may not have any right to occupy the property; rather, the Cookes may have a right. The Court's declaration of these issues will impact Colorado City and its rights and obligations with respect to the Cookes, Robert Black, and the subject property.

12.    This Court therefore has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 2201(a).

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(2).

## GENERAL ALLEGATIONS

**I.    History of the UEP Trust and Land Ownership in Colorado City.**

14.    In 1942, members of the FLDS established the UEP Trust pursuant to Utah law. The Trust was originally established as a charitable trust.

15.    According to the tenets of their faith, FLDS members are expected to dedicate their property – personal and real – to the bishop of the Church. FLDS members seek to hold all property in common.

16.    Once property has been consecrated, the bishop grants an "inheritance" or "stewardship" to each family out of the properties held in trust by the FLDS, according to each family's just wants and needs.

17.    The UEP Trust was established expressly to facilitate this process and to provide a legal mechanism though which FLDS members could consecrate their property to the Church.

18.    Since its inception, the UEP Trust has existed to hold and manage all real estate and improvements consecrated by FLDS adherents.

19.    From its establishment in 1942 until 1998, the UEP Trust was considered a charitable, religious trust. Then, in 1998, the Trust was reformed as a result of the Utah Supreme Court's decision in *Jeffs v. Stubbs*, 970 P.2d 1234 (Utah 1998).

3

20. The *Jeffs* Court held that the UEP Trust was not a charitable trust because it specifically named identifiable beneficiaries. As a result, the Utah court reformed the UEP Trust.

21. After the *Jeffs* decision, the UEP Trustees executed a Restated Trust Declaration. The Trustees sought to ensure that the Trust maintained its designation as "charitable" and that it would be operated according to their faith. As such, the UEP Trustees redefined the Trust's beneficiaries to include all FLDS members who "consecrate their lives, times, talents and resources to the building and establishment of the Kingdom of God on Earth under the direction of the President of the Church."

22. The new definition of "beneficiary" in the 1998 Amended UEP Trust substantially increased the class of Trust beneficiaries.

23. The 1998 Amended UEP Trust document also provides that "the doctrines and laws of the Priesthood and the Church . . . are the guiding tenets by which the Trustees of the United Effort Plan Trust Shall Act." The Restated Trust Declaration also states that the Trust will be administered "consistent with its religious purpose to provide for Church members, according to their wants and needs, insofar as their wants are just . . . ."

## II. The Trust Litigation and Unconstitutional State Control of the Trust.

24. On May 26, 2005, the Utah Attorney General brought an action for breach of trust against the UEP Trustees in the Fifth Judicial District Court for the State of Utah ("the Trust Litigation"). The case is captioned as *In the Matter of the United Effort Plan Trust (Dated November 9, 1942, Amended April 10, 1946, and Amended and Restated on November 3, 1998)*, Case No. 053900848.

25. The Utah Attorney General brought this action as a probate matter pursuant to Utah's Uniform Trust Code and sought "an immediate order suspending the authority and power of the current trustees pending a final decision of the Court on their removal and appointing an interim special fiduciary *for the limited purpose of preserving the assets*

4

*of the trust . . . ."* *In the Matter of the United Effort Plan Trust*, Case No. 053900848, Utah Attorney General's Petition at 2.

26. On May 27, 2005, the Court granted the Utah AG's *ex parte* motion for entry of a temporary restraining order. Pursuant to the TRO, the Court removed the existing Trustees of the Restated Trust.

27. In the same order, the Court appointed Bruce Wisan to act as the UEP's Special Fiduciary. The Order did not specifically identify the powers he would wield.

28. On September 2, 2005, Judge Denise Lindberg, the Utah judge hearing the Trust Litigation, entered an Order expanding the Special Fiduciary's powers. According to this order, Mr. Wisan is vested with the authority to, among other things, "file lawsuits to recover or protect Trust property as such action is deemed reasonable, prudent, and/or necessary in the discretion of the Fiduciary" and to "manage, lease, or rent the property of the Trust as such action is deemed reasonable, prudent, and/or necessary in the discretion of the Fiduciary . . . ."

29. In this same Order, Judge Lindberg solicited input from the parties on methods to appoint new trustees for the UEP Trust.

30. Over the next several months, several individuals submitted various proposals to the Court related to appointing new trustees and reforming the Trust. Each of these proposals was submitted by persons suing the Trust, many of whom were former FLDS members.

31. After receiving these proposals, Judge Lindberg issued a memorandum decision on December 13, 2005, in which she sought to reform the UEP Trust pursuant to the Utah Uniform Trust Code. Though Judge Lindberg recognized that the 1998 amendment document was controlling, she nevertheless held that the Constitution forbade her from reforming the Trust on the basis of religious doctrine. Consequently, she sought to apply "neutral principles of law" to reform the UEP Trust.

///

///

5

32. More particularly, Judge Lindberg indicated that the 1998 Trust document contained both secular and non-secular portions and declared her intent in reforming the Trust to "create a clear division between the two."

33. In this same order, Judge Lindberg allowed the Arizona Attorney General to intervene in the Trust Litigation, stating that the Arizona AG's intervention and involvement, alongside the Utah AG, was appropriate because "the AGs are the community's representatives for ensuring that the charitable purposes of the Trust are protected."

34. On October 25, 2006, Judge Lindberg created the Reformed Trust, and simultaneously expanded the Special Fiduciary's powers.

35. Based upon his new authority, Bruce Wisan was encouraged to continue to pursue his strategy for subdividing Trust property to convey it to beneficiaries of the Trust in a religiously-neutral way.

36. More importantly, Bruce Wisan became the party responsible for identifying beneficiaries of the UEP Trust, as well as determining their "just wants and needs." The term "just wants and needs" is defined by FLDS scripture, and therefore any determination of such just wants and needs must necessarily be made according to religious principles.

37. As the Special Fiduciary, Bruce Wisan's extensive authority requires him to meet the just wants and needs of Trust beneficiaries by, among other things, identifying and providing homes to UEP Trust beneficiaries. He is assisted in this work by the UEP's Advisory Board and its Housing Subcommittee. At all times relevant to this matter, Seth Cooke, Ronald Cooke's brother, sat on both the Advisory Board and the Housing Subcommittee.

38. On October 6, 2008, the FLDS filed a lawsuit in the Utah federal district court against Bruce Wisan, the Utah and Arizona AGs, and Judge Lindberg, arguing that the Utah Court's reformation of the UEP Trust and subsequent administration of the UEP Trust via the Special Fiduciary violated their First Amendment rights ("the FLDS

Lawsuit"). That case is captioned as *The Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Bruce R. Wisan, et al.*, Case No. 2:08-cv-772.

39. The FLDS Lawsuit claims, among other things, that the manner in which Bruce Wisan, Utah, and Arizona have administered the UEP Trust since its state-authorized takeover in 2006 is contrary to the UEP Trust's express religious purposes and is therefore unconstitutional.

40. The FLDS Lawsuit notes that, according to the 1998 Trust document, continued enjoyment of UEP Trust participation and benefits is intended to be conditioned upon a beneficiary's living in accordance with the tenets of the faith. By divorcing the UEP Trust's operation from its religious underpinnings, the FLDS argues that the Utah Court violated the Establishment and Free Exercise Clauses of the United States Constitution.

41. On February 24, 2011, Judge Dee Benson of the Utah federal district court issued a Memorandum Opinion and Order granting a preliminary injunction which extends the terms of a previously entered TRO.

42. Judge Benson's February 24, 2011 decision holds that Judge Lindberg's action in reforming the Trust to require that it be administered pursuant to neutral, non-secular principles violated the Establishment Clause by inhibiting religion and by fostering excessive government entanglement with religion.

43. Judge Benson also held that the "state actors had no authority to act as they did," referring to not only the reformation of the Trust, but also to the appointment of Bruce Wisan as the Special Fiduciary and to defining the scope of Bruce Wisan's authority as requiring him to administer the Trust consistent with neutral legal principles.

44. Judge Benson's decision also finds that, while the parties did not focus their arguments as heavily on the Free Exercise Clause, it was likely that, on the record as developed at the time of the decision, the FLDS plaintiffs would succeed on this claim as well.

### III. The Special Fiduciary's Land Reassignment and Subdivision Efforts.

45. Upon information and belief, at the time the Trust Litigation was initiated, the UEP Trust owned and controlled approximately 90% – 95% of all real property in Colorado City.

46. Prior to Bruce Wisan's appointment as Special Fiduciary, FLDS members lived on land consecrated by their ancestors. Changes in the families occupying any particular parcel within Colorado City were infrequent.

47. This began to change significantly after Bruce Wisan began to exercise his Court-authorized powers.

48. Bruce Wisan has reassigned property from those FLDS members currently occupying property to non-FLDS persons who allegedly are UEP Trust beneficiaries.

49. More often than not, Bruce Wisan has undertaken these reassignments without following the proper procedures. Specifically, and upon information and belief, neither the UEP Trust nor Bruce Wisan has ever filed a forcible detainer action in Arizona against an existing occupant of any residential property to extinguish the existing resident's rights, prior to reassigning the property.

50. This is contrary to Arizona law and has resulted in, and continues to cause, frequent and on-going civil property disputes within Colorado City between competing interested parties. Colorado City police authorities are often called to respond to these disputes, though they are essentially civil property matters.

51. Upon information and belief, Bruce Wisan's property reassignments are part of a greater effort to force individual property ownership onto a community comprised of almost exclusively FLDS members.

52. One way in which Bruce Wisan has sought to privatize land ownership in Colorado City is by subdividing the UEP Trust property into individual parcels that can be sold to individual owners.

53. Bruce Wisan's efforts to subdivide land in the community began almost immediately upon his appointment and were in full swing by 2007.

54. Bruce Wisan's efforts, including those to privatize most of Colorado City, are supported and augmented by both the Utah and Arizona AGs, both of whom have been more active in the UEP Trust Litigation than has the Special Fiduciary himself. Indeed, at times, the positions taken by the AGs' offices appear to be on behalf of Bruce Wisan in his position as Fiduciary, rather than in AG office's representative capacity on behalf of putative UEP Trust beneficiaries.

55. Furthermore, the Utah Court has ratified Bruce Wisan's subdivision efforts, even though they are often taken lawlessly.

56. As part of its efforts to subdivide and privatize real property in Colorado City, the UEP Trust has sought to have Colorado City and Hildale, Utah (its neighboring community) extend new water service to proposed subdivision lots.

57. The UEP Trust and Bruce Wisan have sought these new water connections despite knowing about the water shortage of 2007 and the resultant uniform policy to restrict new connections.

58. Further, the UEP Trust and Bruce Wisan have shown an unwillingness to bear any cost associated with the extension of infrastructure to these properties, especially as those costs relate to culinary water service. Rather, the UEP Trust, through Bruce Wisan, has advised Colorado City that it should bear the costs.

59. When Colorado City rejected this notion, Bruce Wisan made oblique threats about "ways to get around" the problem. Colorado City did not become aware until later that Bruce Wisan's decision to place the Cooke family on the subject property was likely part of the UEP Trust's overarching goal to privatize the land and force Colorado City to bear the cost of providing the culinary water-related infrastructure.

**IV.   The Cooke Lawsuit.**

60. In 2010, the Cookes filed a lawsuit in this Court, at Case No. 3:10-cv-08105-JAT, against Colorado City, the City of Hildale, Utah (sometimes collectively referred to as "the Twin Cities") and several other defendants ("the Cooke Lawsuit"). In the Cooke Lawsuit, the Cookes allege that Colorado City discriminated against them by

9

1  denying the Cookes a culinary water connection on the basis of the Cookes' religion and
2  Mr. Cooke's disability.

3  61. According to the Cooke Lawsuit, Mr. Cooke was raised in the Twin Cities.
4  He is a former member of the FLDS, but left the FLDS as a teenager.

5  62. Mr. Cooke claims that after he left the FLDS, he moved to Phoenix. While
6  living in Phoenix, Mr. Cooke was reportedly in a very serious accident that rendered him
7  permanently disabled.

8  63. Sometime in late 2007 or early 2008, the Cookes decided to return to
9  Colorado City from Phoenix, Arizona.

10  64. As a former FLDS adherent, Mr. Cooke believes that he is a beneficiary of
11  the UEP Trust. Consequently, on or about February 11, 2008, Ronald Cooke submitted a
12  Petition for Benefits to the UEP Trust.

13  65. This Petition was approved the same day it was submitted.

14  66. In submitting the Petition for Benefits, Mr. Cooke responded to offers from
15  the UEP Trust – made by and through Seth Cooke, who was both Ronald Cooke's brother
16  and a member of the UEP Advisory Board – for housing. Indeed, Ronald Cooke's belief
17  that the UEP Trust would provide him with affordable housing was his primary impetus
18  for returning to Colorado City.

19  67. Mr. Cooke, and/or someone on his behalf, coordinated with the UEP Trust
20  to identify a property for the Cookes to occupy. Mr. Cooke claims he was seeking
21  "suitable, affordable housing."

22  68. According to the Cooke Lawsuit, suitable housing was housing with
23  existing culinary water to assist in caring for Mr. Cooke's disability, as well as "reliable
24  electricity" to run the medical device he alleges he needs to assist his breathing at night.

25  69. In spite of the fact that the UEP Trust and/or Bruce Wisan knew about Mr.
26  Cooke's needs, and though there were other unoccupied properties in Colorado City at the
27  time the Cookes sought housing, the UEP Trust and/or Bruce Wisan nevertheless elected
28

to assign the Cookes the property at 420 East Academy, Colorado City, Arizona for residential occupancy ("the Property").

70. On February 11, 2008, the same date that Mr. Cooke submitted his Petition for Benefits to the UEP Trust, Bruce Wisan issued the Cookes an Occupancy Agreement for the Property.

71. The Property never had an existing culinary water connection.

72. At all times relevant to the Cooke Lawsuit, the Twin Cities' Utility Board had a uniformly applied, non-discriminatory policy in place providing that no new service locations would be connected to the culinary water system unless the applicant is able to adequately bring water to the system.

73. The Utility Board developed the policy after the Twin Cities experienced several summers during which a critically-high demand for water existed, culminating in an emergency water shortage in the summer of 2007.

74. Though the UEP Trust's Advisory Board and/or Bruce Wisan were aware of the Utility Board's policy and the Twin Cities' concerns about water shortages, and though the UEP Trust and/or Bruce Wisan were aware of Mr. Cooke's professed need for culinary water to meet the needs of his disability, Bruce Wisan nevertheless entered into an occupancy agreement with Ronald Cooke for the Property.

75. The Cookes moved onto the Property in May 2008. At that time, the "residence" on the Property consisted only of a partially-constructed slab and frame built by someone other than the Cookes. The Property did not have an existing culinary water connection.

76. On April 1, 2008, Seth Cooke contacted the utility department about the availability of utility service, including water, for the Property. Upon information and belief, Seth Cooke took these actions on behalf of his brother, Ronald Cooke.

77. At all times relevant to this Firth Amended Complaint, Seth Cooke was a member of the UEP Trust Advisory Board, as well as the UEP Trust's Housing Subcommittee.

11

78. On April 1, 2008, Seth Cooke also met with Colorado City personnel, who explained the water connection policy to Seth Cooke and other agents for Ronald Cooke who were present at that meeting. Colorado City personnel also explained that to apply for utility service, the Cookes had to complete an application, pay applicable fees, and meet other standard requirements.

79. The Cookes failed to complete their application or comply with other requirements to establish service.

80. The Cookes never submitted an application to establish a new culinary water service location. The Cookes were therefore unsuccessful in obtaining culinary water service.

81. About this same time, the Cookes asked how to apply for a building permit. Colorado City building officials reviewed the necessary requirements and plan submittal checklists with the Cookes multiple times in 2008, but the Cookes never applied for a building permit.

82. Though the Cookes never applied for, or obtained, a building permit, they and their agents, including Seth Cooke, began construction on the Property in May 2008.

83. On October 24, 2008, approximately five months after moving to the Property, Mr. Cooke delivered a letter addressed to the Colorado City Utility Board and/or Colorado City to Colorado City's Town offices. The letter advises, for the first time, that Mr. Cooke is allegedly disabled and that he needs electrical service for his breathing machine at night. This letter also asks for culinary water, but does not indicate the request is made in the form of one for reasonable accommodation.

84. Ronald Cooke delivered a similar letter to the City of Hildale on October 24, 2008.

85. On December 15, 2008, Hildale's Business Manager responded to Mr. Cooke and again explained that a new water connection could not be provided due to the Utility Board's policy. The Business Manager further explained that the Twin Cities' culinary water system was already overextended and that both municipalities feared that

the addition of any new service locations on the already overly-taxed system could lead to systemic failure, endangering the public health, safety, and welfare, as had occurred in July 2007.

86. On December 23, 2008, Ronald Cooke filed a Housing Discrimination Complaint with the Arizona Civil Rights Division ("the ACRD"), alleging that Colorado City, along with other governmental entities, including the City of Hildale, discriminated against him on the basis of religion and disability by denying him utilities, including a culinary water connection.

87. Though the ACRD should have brought the UEP Trust into the case, given that it functions as the landlord on the Property, the ACRD failed to do so.

88. Upon information and belief, the cost of providing a new water connection to the Cookes may be as high as $150,000.00, since Colorado City would likely have to drill a new well to provide the additional water necessary to meet the demands of this new connection.

89. In December 2009, the parties and an attorney for the UEP Trust participated in a teleconference to discuss settlement of the housing discrimination complaint. The UEP Trust participated in these discussions at Colorado City's and Hildale's urging.

90. All settlement efforts were unsuccessful.

91. Subsequently, in June 2010, the State of Arizona filed a lawsuit against Colorado City in the Maricopa County Superior Court. The Cookes retained private counsel and filed a corresponding lawsuit, alleging federal claims, in this Court in June 2010. The State has since intervened in the federal action, and the Cooke Litigation is now proceeding as a single action in this Court before Judge Teilborg.

**V.     Robert Black and the Competing Interests in the Subject Property.**

92. Prior to 2007 and Bruce Wisan's involvement, and pursuant to authority granted by the UEP Trust, Robert Black inhabited the Property. Upon information and belief, Mr. Black is an FLDS member.

13

93. In 2001, Mr. Black obtained a building permit from Colorado City to begin constructing a home on the Property. After obtaining the building permit, Mr. Black put in the slab on the Property and framed the house.

94. Given the unique form of land ownership common to Colorado City, most properties are not covered by residential mortgages, and obtaining construction loans is all but impossible. Consequently, residential construction occurs over an extended period of time, as residents build only as the resources are available to do so. Oftentimes, this means that a home can take several years to build from the start of construction to move-in.

95. Upon information and belief, Mr. Black ceased construction work on the Property. The precise date upon which Mr. Black ceased his work at the Property is unknown.

96. The UEP Trust and Bruce Wisan subsequently declared that Mr. Black had abandoned the Property, yet neither the UEP Trust nor Bruce Wisan took any action to extinguish Mr. Black's right to occupy the property, as required under Arizona law.

97. Instead, the UEP Trust and Bruce Wisan went forward and assigned the Cookes to the Property, even though they had not first extinguished Mr. Black's rights. Upon information and belief, this "reassignment" of the Property from an FLDS member to a non-FLDS UEP Trust beneficiary was intended to serve the UEP Trust's overarching efforts to move Colorado City towards private land ownership via the creation and sale of subdivided property.

98. Upon information and belief, Robert Black believes that he is the rightful occupant of the Property.

99. In fact, in September 2009, Robert Black showed up to a Utility Board meeting and advised the Board that he intended to continue to assert his rights to the Property.

100. Additionally, on September 14, 2009, Robert Black attended a Colorado City Town Council meeting. At this meeting, Mr. Black told the Council that he believed

he was entitled to inhabit the Property. Mr. Black's assertion of an on-going right to occupy the Property caused the City Council great concern, as the Council was being asked, in the context of the Cooke Litigation, to provide a new culinary water connection to the Property for the Cookes.

101. The Council worried that if the Cookes were not legally entitled to occupy the Property, they may not achieve a final settlement of the Cooke Litigation even if they agreed to establish a new culinary water service location at the Property.

102. In October 2009, and as further evidence of Mr. Black's intent to assert a right to occupy the Property, Mr. Black inquired about obtaining – and ultimately applied for – another building permit for the Property.

103. Due to the Cookes' and Robert Black's competing claims and interests in the Property, Colorado City seeks declaratory relief regarding whether Bruce Wisan's conduct, as the Special Fiduciary of the UEP Trust, violated the United States Constitution. Colorado City also seeks declaratory relief regarding whether the Cookes or Mr. Black have the right to occupy the Property.

### COUNT ONE
### (Declaratory Relief)

104. Colorado City incorporates the above paragraphs as though fully set forth herein.

105. In his February 24, 2011 Order, Judge Benson concluded that any and all actions Bruce Wisan has taken following Judge Lindberg's reformation of the UEP Trust on December 13, 2005 were unconstitutional because they violated the First Amendment.

106. Bruce Wisan's conduct impacted Colorado City directly. Yet, Judge Benson's Order is not binding in Arizona. Having an Order that applies to only Hildale City, Utah and not to Colorado City, Arizona is inherently problematic, as the two Twin Cities are for all practical purposes one in the same for the citizens who reside in that area.

///

///

107. Colorado City therefore seeks a declaration from this Court regarding whether Bruce Wisan's conduct was unconstitutional because it violated the First Amendment.

108. If this Court concludes that Bruce Wisan's conduct was unconstitutional, then Bruce Wisan lacked any authority to approve Ronald Cooke's February 11, 2008 Petition for Benefits. That approval is therefore void.

109. If Ronald Cooke's Petition for Benefits and its subsequent approval are void, he was not eligible to receive Trust benefits, including, but not limited to, an assignment of any UEP Trust-owned housing. Therefore, the Occupancy Agreement issued to Ronald Cooke on February 11, 2008 for the Property is void and unenforceable.

110. If the Occupancy Agreement is void and unenforceable, the Cookes do not have a legal right to occupy the Property.

111. If this Court concludes that Bruce Wisan's conduct was constitutional, then Robert Black may not have any claim or interest in the Property.

112. Colorado City requests this declaration so that it knows its, and the parties', respective rights and obligations regarding the Property.

### COUNT TWO
**(Declaratory Relief)**

113. Colorado City incorporates all facts set forth above as though fully set forth herein.

114. Colorado City does not know, nor can it determine, who the rightful occupier of the Property was in May 2008. Moreover, Colorado City does not know who the rightful occupier was from May 2008 to the present. Both the Cookes and Robert Black claim that they are the rightful occupier.

115. Until a determination is made as to which person or persons had/has the lawful right to occupy the Property, Colorado City does not know how to act. Colorado City may also find itself required, as part of the Cooke Lawsuit, to provide a new water connection to property which the Cookes may not be lawfully entitled to inhabit.

116. Colorado City's water shortage policy was enacted to uniformly ensure that sufficient culinary water is available to serve existing customers. Providing new water connections where, as here, the property occupiers have not met the existing policy for establishing the new connection jeopardizes the availability of water in Colorado City for daily and emergency use.

WHEREFORE, the Town of Colorado City requests that this Court provide the following relief:

(a) A declaration regarding whether Bruce Wisan's conduct was constitutional;

(b) A declaration regarding whether any and all actions that Bruce Wisan took with respect to the Property and/or the Cookes' occupancy of the Property after December 13, 2005 are unconstitutional and therefore void;

(c) A declaration regarding whether Ronald Cooke's Petition for Benefits dated February 11, 2008 is void and unenforceable because it was approved by Bruce Wisan, who lacked any legitimate authority to review and/or grant said Petition.

(d) A declaration regarding whether Ronald Cooke's February 11, 2008 Occupancy Agreement for the Property, and any other subsequent Occupancy Agreement for that Property approved by Bruce Wisan, is void and unenforceable.

(e) A declaration regarding whether, at all times relevant to the Cooke Litigation, the Cookes had any legal authority to occupy the Property.

(f) A declaration regarding whether the Cookes or Robert Black had the rightful legal authority to occupy the Property between May 2008 and the present; and

(g) For such other and further relief as this Court deems just and proper.

DATED this ___ day of July 2011.

GRAIF BARRETT & MATURA, P.C.


By _____
Jeffrey C. Matura
1850 North Central Avenue, Suite 500
Phoenix, Arizona  85004
Attorneys for Plaintiff Town of Colorado City

17

**CERTIFICATE OF SERVICE**

I hereby certify that on _____, 2011, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF system for filing and transmittal of Notice of Electronic filing to the following CM/ECF registrants:

Michael L. Parrish
Stinson Morrison Hecker, LLP
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004
Attorneys for Defendants

4849-3559-5273