1   **WO**

2

3

4

5

6               IN THE UNITED STATES DISTRICT COURT

7                 FOR THE DISTRICT OF ARIZONA

8

9   Town of Colorado City, an Arizona                No. CV11-08037-PCT-DGC
    municipality, et al.,

10                                                   **ORDER**
                           Plaintiffs,

11   v.

12   United Effort Plan Trust, et al.,

13                           Defendants.

14

15         Plaintiff Town of Colorado City ("Colorado City") and Plaintiff-Intervenors

16   Hildale City, Twin City Water Authority, and Twin City Power (collectively "Hildale")

17   have filed motions for summary judgment on their respective complaints for declaratory

18   judgment, and the motions have been fully briefed.  Defendants Ronald Cooke and Jinjer

19   Cooke; Defendants United Effort Plan Trust ("UEP Trust" or "the Trust") and Bruce

20   Wisan, special fiduciary; and Defendant-Intervenors Utah Attorney General and Arizona

21   Attorney General have also filed motions for summary judgment.  These motions have

22   been fully briefed.  For the reasons that follow, the Court will grant Plaintiffs' and

23   Plaintiff-Intervenors' motions in part and deny them in part, and will grant Defendants

24   and Defendant-Intervenors motions in part and deny them in part. [1]

25

26   _____

27       [1] The parties' requests for oral argument are denied because the issues have been
     fully briefed and oral argument will not aid the Court's decision.  *See* Fed. R. Civ. P.
28   78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

## I.   Background.

This declaratory judgment action arises from an underlying controversy over whether Colorado City and Hildale (collectively "Plaintiffs") are obligated to provide water and electrical services to Ronald and Jinjer Cooke who occupy a parcel of UEP Trust property ("the Property") in Colorado City.  *See Cooke v. Town of Colorado City, et al.*, No. 3:10-cv-08105-JAT.   Colorado City, Arizona, and Hildale City, Utah, are "Twin Cities" that make up a common community that spans the Arizona/Utah border. Up to 95% of the land in the Twin Cities is owned and controlled by the UEP Trust, a religious and charitable trust established by members of the Fundamentalist Church of Jesus Christ of Latter-Day Saints ("FLDS"), and the population of these cities is comprised almost entirely of FLDS members.  Doc. 16, ¶¶ 2, 14, 45; Doc. 121, ¶¶ 50, 56. Plaintiffs seek a judgment declaring (1) whether trust property transactions executed by special fiduciary Bruce Wisan following a 2005 court-ordered reformation of the Trust are unconstitutional, and (2) whether the Cookes or rival claimant Robert Black have had the legal right to occupy the Property from the time of the Cooke's professed occupancy agreement with Bruce Wisan in 2008 to the present.  Docs. 16, ¶¶ 107, 115;

### A.   The UEP Trust.

The UEP Trust was established by FLDS members in 1942 as a charitable and religious trust under Utah state law.  Doc. 16, ¶ 14.  The Trust was founded upon the tenets of the FLDS faith, by which members are expected to "consecrate" their real and personal property to a Bishop of the FLDS Church, and the church then holds the property in common and redistributes an "inheritance" or "stewardship" to each family according to its "just wants and needs."  *Id.*, ¶¶ 15-17.  The Trust was established to hold and manage all such consecrated properties in the Twin Cities.  *Id.*, ¶ 18.

### B.   Relevant UEP Trust Litigation.

Litigation over Judge Lindberg's reformation of the UEP Trust has arisen in several courts and cases.  The Court will summarize those cases briefly.

1.       **1998 Litigation (*Jeffs v. Stubbs*) and Restated Trust Declaration.**

The UEP Trust originally provided benefits to specific individuals, but on September 1, 1998, the Utah Supreme Court ruled in *Jeffs v. Stubbs*, 970 P.2d 1234, 1253 (Utah 1998), that this violated the legal requirements for designation as a charitable trust. Following *Jeffs*, the UEP Trust trustees executed a Restated Trust Declaration in which they redefined the Trust beneficiaries to include "all FLDS members who 'consecrate their lives, times, talents and resources to the building and establishment of the Kingdom of God on Earth under the direction of the President of the Church.'"  Doc. 16, ¶ 21.  The Restated Trust Declaration expanded the class of potential trust beneficiaries, but continued to maintain that FLDS doctrines were its guiding tenets and that the Trust be administered "'consistent with its religious purpose to provide for Church members, according to their wants and needs, insofar as their wants are just[.]'"  *Id.*, ¶¶ 22-23.

2.       **2005 Breach of Trust Litigation and Trust Reformation.**

On May 26, 2005, the Utah Attorney General filed a breach of trust action in Utah's Third District Court ("Probate Action") against the then-current trustees for failure to defend the Trust in two tort lawsuits, petitioning the court to remove the trustees and appoint an interim special fiduciary to administer the Trust.  Doc. 16, ¶ 24; *In the Matter of the United Effort Plan Trust*, Case No. 053900848; *see FLDS v. Wisan*, 773 F.Supp.2d 1217, 1057-58 (Utah 2010) (discussing the Utah Attorney General's 2005 petition) *vacated and remanded by FLDS v. Horne*, 698 F.2d 1295 (10th Cir. 2012).  The probate court removed the existing trustees and appointed Bruce Wisan as special fiduciary.  Doc. 16, ¶¶ 26-27.  Mr. Wisan's duties included filing lawsuits on behalf of the Trust and managing, leasing, or renting trust properties.  *Id.*, ¶ 28.  After soliciting the parties' recommendations on the procedures for appointing new trustees, Judge Denise Lindberg issued a memorandum decision on December 13, 2005, finding that the Trust must be reformed pursuant to Utah's Uniform Trust Code.  *Id.*, ¶ 31.  Judge Lindberg declared her intent to reform the Trust on "neutral principles" rather than religious doctrine, and to make a clear separation between secular and non-secular provisions.  *Id.*,

¶ 32.   On October 25, 2006, Judge Lindberg created the Reformed UEP Trust and simultaneously expanded Mr. Wisan's powers to include naming trust beneficiaries and identifying their "just wants and needs" for purposes of assigning trust property.  *Id.*, ¶¶ 34-37.

### 3. 2008 Injunction in Utah Federal District Court: *FLDS v. Wisan*.

On October 26, 2008, an association of FLDS members (the "Association") filed suit in Utah Federal District Court ("Federal District Court Action") challenging Judge Lindberg's reformation of the Trust and appointment of Bruce Wisan as trustee.  Doc. 16, ¶ 38; *see FLDS v. Wisan*, 773 F.Supp.2d 1217 (D. Utah 2011).  The Association alleged that Judge Lindberg's reformation of the Trust and Mr. Wisan's ongoing administration according to "neutral" principles divorced the Trust from its religious underpinnings in violation of the Establishment and Free Exercise Clauses of the United States Constitution.  Doc. 16, ¶¶ 39-40.  On February 24, 2011, Judge Dee Benson granted a preliminary injunction in favor of the Association, finding that the reformation and change in administration of the Trust pursuant to Judge Lindberg's orders fostered excessive government entanglement with religion in violation of the Establishment Clause and likely violated the Free Exercise Clause.  *Id.*, ¶¶ 42-43; *see FLDS v. Wisan*, 773 F.Supp.2d at 1233, 1244.

### 4. 2009 Petition to Utah Supreme Court, *FLDS v. Lindberg*.

While the Federal District Court Action was stayed pending settlement negotiations, but before that court granted the Association's motion for a preliminary injunction, the Association filed a Petition for Extraordinary Writ in the Utah Supreme Court ("Utah Supreme Court Action"), challenging Judge Lindberg's reformation of the Trust and Mr. Wisan's subsequent administration as unconstitutional and in violation of Utah law.  Doc. 132, ¶ 34; *see FLDS v. Lindberg*, 238 P.3d 1054, 1056 (Utah 2010).  The Utah Supreme Court held that because the Association had delayed its challenge for nearly three years, during which time many parties had engaged in transactions in reliance upon the Trust's modifications, its claims were barred by laches.  *Id.* at 1056,

1066.  Judge Benson considered this finding before granting the Association's motion for a preliminary injunction, but found that laches did not apply to constitutional issues and that the Utah Supreme Court's decision was not a decision on the merits for purposes of res judicata.  *FLDS v. Wisan*, 773 F.Supp.2d at 1237-38, 1242.

### 5.    2012 Reversal of Preliminary Injunction.

After Judge Benson granted the Association's motion for a preliminary injunction in the Federal District Court Action, the defendants filed interlocutory appeals with the Tenth Circuit Court of Appeals.  *FLDS v. Horne*, 698 F.2d 1295 (10th Cir. 2012).  The Tenth Circuit certified a question to the Utah Supreme Court regarding the preclusive effect under Utah law of that court's laches ruling on the Association's Petition for Extraordinary Writ.  *Id.* at 1299.  The Utah Supreme Court held that its laches ruling in *Lindberg* was sufficient for preclusion and that constitutional issues are not immune from laches.  *Id.* at 1301-02.  Finding that it was required to give preclusive effect to the Utah Supreme Court's ruling in *Lindberg*, the Tenth Circuit vacated Judge Benson's order granting the preliminary injunction and remanded with orders to dismiss the action on res judicata grounds.  *Id.* at 1302.

### 6.    2010 Cooke Litigation.

On June 24, 2010, Ronald and Jinjer Cooke filed a civil rights action against Colorado City and Hildale, alleging, in relevant part, that after they entered into an occupancy agreement with Bruce Wisan and the UEP Trust to occupy the Property in 2008, Colorado City and Hildale discriminatorily denied them water and electrical services because they were not members of the FLDS Church.  No. 3:10-cv-08105-JAT, Doc. 1, ¶¶ 19-20, 23-26, 65.

### 7.    This Action.

Colorado City filed this action for declaratory judgment on March 11, 2011, after Judge Benson granted the Association's motion for preliminary injunction on February 24, 2011, but before the Tenth Circuit reversed and vacated that decision on November 5, 2012.  Doc. 1.  Plaintiffs assert in claim one that a declaratory judgment is needed to

clarify whether actions taken by Bruce Wisan in relation to trust property are unconstitutional, making the purported rights the Cookes acquired in the Property void and eliminating any obligation Plaintiffs may have to provide them services.  Docs. 16, ¶¶ 109-110; 121, ¶¶ 114-115.  Plaintiffs assert in claim two that because both the Cookes and Robert Black profess legal rights to the Property, resolving whether Black has superior rights that nullify the Cookes' occupancy agreement is essential to knowing whether Plaintiffs owe any past or ongoing obligation to the Cookes.  Docs. 16, ¶ 115; 121, ¶ 120.

## II.   Legal Standards.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Declaratory Judgment Act states that "[i]n a case of actual controversy within its jurisdiction [with noted exceptions] . . . any court of the United States, upon filing of an appropriate pleading, may declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  The Court has discretion to grant or decline jurisdiction over declaratory actions.  *Id.*  The statute is "deliberately cast in terms of permissive, rather than

1   mandatory, authority." *Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1223 (9th Cir.

2   1998) (quoting *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 250 (1952) (J.

3   Reed, concurring)).  The Court's discretion is not unfettered; it must look to the *Brillhart*

4   factors for guidance in exercising its discretion.  *See Dizol*, 133 F.3d at 1223.  "The

5   district court should avoid needless determination of state law issues; it should discourage

6   litigants from filing declaratory actions as a means of forum shopping; and it should

7   avoid duplicative litigation."  *Id.* at 1225.

8   **III.    Constitutionality of the Reformed UEP Trust.**

9          In light of the Tenth Circuit's reversal of Judge Benson's ruling, Plaintiffs assert

10  that no court has ruled on the constitutionality of Judge Lindberg's reformation of the

11  UEP Trust.  Doc. 127 at 2.  They argue that they will be greatly aided by a declaratory

12  judgment on the constitutionality of the Reformed UEP Trust and Bruce Wisan's actions

13  and that neither res judicata nor laches apply to them because (1) they did not previously

14  litigate the constitutional claim, and (2) they now have a distinct interest that did not arise

15  until 2010 when the Cooke's filed their civil rights lawsuit.  *Id.* at 7-10.  Defendants[2]

16  argue that res judicata, collateral estoppel, and laches apply, barring Plaintiffs from relief

17  on their first claim.[3]

18         **A.    Res Judicata.**

19         "Res judicata bars relitigation of all grounds of recovery that were asserted, or

20  could have been asserted, in a previous action between the parties, where the previous

---

[2] Defendants Ronald and Jinjer Cooke and Defendants UEP Trust and Bruce Wisan have joined in all other Defendants' and Defendant-Intervenors' motions for summary judgment and in all other responses to Plaintiffs' motions.  For the sake of simplicity, the Court will refer to all Defendants and Defendant-Intervenors collectively as "Defendants" and delineate their separate arguments only through document numbers.

[3] Defendants also argue that the Court should not address Plaintiff's first claim for relief for a number of reasons, including that the Tenth Circuit's ruling in *FLDS v. Lindberg* moots this claim, that Plaintiffs' do not have standing to assert a constitutional injury, that resolving the constitutional question will not resolve the underlying dispute of whether the Cookes are entitled to the Property, and that the *Brillhart* factors weigh against the Court taking jurisdiction.  *See, e.g.*, Docs. 134 at 6-15; 144 at 3-4; 163 at 3-6; 164 at 3-5; 166 at 6-11.  The Court has considered these arguments and finds that they lack sufficient merit to prevent the Court from addressing Plaintiff's first claim for relief.

action was resolved on the merits." *United States ex rel. Barajas v. Northrup Corp.*, 147 F.3d 905, 909 (9th Cir. 1998).  Defendants argue that res judicata bars Plaintiffs from seeking a judgment on constitutional grounds because Plaintiffs seek only to promote the rights of Robert Black as against the Cookes, and Mr. Black, as a member of the Association, already litigated the constitutional claim both in the Federal District Court Action (*FLDS v. Wisan*) and in the Utah Supreme Court Action (*FLDS v. Lindberg*). Docs. 130 at 10-13; 131 at 3.  The Court is not persuaded that Plaintiffs are merely attempting to relitigate the claims of Mr. Black.  As the Court noted in its previous orders denying Defendants' motions to dismiss, Colorado City asserted that it could be required to expend as much as $150,000 to drill a well absent a declaration that the Cookes' right to the Property under the 2008 occupancy agreement is invalid.  *See* Docs. 43 at 6; 48 at 6.  Plaintiffs thus risk sufficient injury to assert a claim for declaratory judgment on their own behalf and are not merely acting on behalf of Mr. Black.

Defendants argue that Plaintiffs appeared and actively participated in the Probate Action (*In the Matter of the UEP Trust*) and in two petitions for emergency writs before the Utah Supreme Court, and this effectively renders them parties to those actions. Doc. 135 at 6-8.  The Court will address Plaintiffs' involvement in each of these actions.

### 1.    The 2005 Probate Action.

The undisputed facts show that Colorado City and Hildale City (collectively "the Cities") filed a motion for a temporary restraining order ("TRO") in the Probate Action on July 15, 2008, requesting the removal of Mr. Wisan as special fiduciary.  Doc. 136, ¶ 86; *see* Doc. 136-9 at 2-4.  The Cities argued that Mr. Wisan had breached his fiduciary duties by, among other things, attempting to subdivide trust property without regard to serious impacts on the Cities, such as the need to provide access and utilities to individual lots; selling off trust assets; requiring trust beneficiaries to sign occupancy agreements and pay monthly assessments; and displacing families.  Doc. 136-9 at 6-22, ¶¶ 26-35, 41-45.  The Cities claimed standing to seek the TRO as "interested persons" under Utah's Uniform Probate Code.  Doc. 136-9 at 7.  The court ruled on the motion and denied it on

1   both procedural and substantive grounds.  Doc. 136-9 at 34-36.

2   In April of 2009, the Cities participated via formal invitation from the Arizona
3   Attorney General in four days of settlement negotiations related to a pending sale of trust
4   property ("Berry Knoll") in the Probate Action.  Doc. 136, ¶¶ 92-95.  After these talks
5   failed and the probate court approved the proposed sale on August 24, 2009, the Cities
6   filed an "Expedited Motion to Intervene" in the Probate Action, arguing that they had an
7   interest in stopping the sale because the purchaser of Berry Knoll intended to export its
8   water, endangering the Cities' already over-taxed groundwater supply.  Doc. 136-11 at 2-
9   4; 6-13.  The court denied this motion on November 2, 2009, stating that it had "already
10  determined who are the exclusive parties with standing in this probate action[,]" that the
11  Cities lacked a legally cognizable interest because they owned no land at issue, could bid
12  on Berry Knoll themselves, and would still retain authority to regulate water usage within
13  their borders without intervention.  Doc. 136-11 at 38-42; 40.  The Cities filed a Petition
14  for Extraordinary Writ with the Utah Supreme Court, seeking to reverse the probate
15  court's approval of the sale of Berry Knoll, and the Utah Supreme Court denied their
16  petition without comment.  Doc. 136-15 at 32-40, 42-45.

17  ### 2.    The 2010 Utah Supreme Court Action.

18  The Cities filed a response to the Association's Petition for Extraordinary Writ
19  before the Utah Supreme Court in *FLDS v. Lindberg*.  Doc. 136-16 at 2-17.  The Cities
20  argued that the "trial court's management of the [UEP Trust] has veered so completely
21  off course as to jeopardize the health, safety and welfare of thousands of people in the
22  Twin Cities, and compromise the basic function of local government."  *Id.* at 3.  They
23  clarified that "the Twin Cities are not the FLDS church[,]" and went on to state that
24  "since the majority of the petitioners' claim for relief deals with their ability to freely
25  practice their religion, the Twin Cities do not address those issues."  Doc. 136-16 at 3.
26  The Utah Attorney General filed a motion to strike the Cities' response which the
27  Arizona Attorney General joined, and the Cities filed an additional response in opposition
28  to this motion.  *See* Doc. 136-17 at 3, 3 n. 1.  The Utah Supreme Court granted the

motion to strike to the extent that the Cities' response presented independent affirmative claims for relief from the Association's petition.  Doc. 136-17 at 14.  It reasoned that "[i]ndependent claims for relief may not be presented in the guise of a response to a petition for extraordinary relief."  *Id.*

### 3.  Plaintiffs' Arguments.

Plaintiffs argue, and the Court agrees, that they were not parties to either the Probate Action or the Utah Supreme Court Action for res judicata purposes.  Although the Cities filed a motion for a TRO in the Probate Action, and the probate court responded, the court's order was not a final judgment on the merits.  When the Cities later moved to intervene as parties following the court's approval of the Berry Knoll sale, the court denied the motion, finding that they lacked standing.  The court stated that it had previously shown its willingness to hear from the Cities on issues of concern to them and that its ruling would not prevent them from continuing to make their views known Doc. 136-11 at 40.  This, however, is not the same as having an opportunity to assert their claims as parties to the action.  As Plaintiffs argue, "[i]n no way did the Court have an obligation to consider, much less rule upon, any of the concerns raised by the Twin Cities."  Doc. 153 at 5.

The Cities were also not parties to the Utah Supreme Court Action.  Their lack of party status is confirmed by the fact that the Utah Supreme Court granted the motion to strike their response to the Association's petition for extraordinary relief to the extent that the Cities asserted any of their own, independent claims.

The Utah Supreme Court did make a final ruling on the merits of a claim brought by the Cities as a party when it denied their Petition for Extraordinary Writ challenging the probate court's approval of the Berry Knoll sale, but this action only challenged the trial court's ruling on a discrete issue.  It did not make the Cities a party to the Probate Action, nor did it afford the Cities an opportunity to make additional claims before the Utah Supreme Court such that the court's ruling would have preclusive effect on the claims asserted here.

1

**B.     Issue Preclusion/Collateral Estoppel.**

2          Defendants argue that, at a minimum, the Cities' participation in the above cases

3   renders them *de facto* parties for purposes of issue preclusion.  Doc. 135 at 7-8.  The

4   doctrine of issue preclusion, also known as collateral estoppel, "prevents parties or their

5   privies from relitigating facts and issues in the second suit that were fully litigated in the

6   first suit." *Buckner v. Kennard*, 99 P.3d 842, 846 (Utah 2004) (internal quotation marks

7   and citations omitted).  Issue preclusion is broader than res judicata or claims preclusion

8   because it prevents relitigation of issues that have been fully litigated and decided in a

9   prior action even if the claims for relief are not the same. *Oman v. Davis School Dist.*,

10  194 P.3d 956, 966 (Utah 2008).  Under Utah law, issue preclusion requires four elements:

11  (1) the party against whom preclusion is asserted must have been a party to or in privity

12  with a party to the prior action, (2) the issue decided in the prior action must be identical

13  to the one presented in the current action, (3) the issue must have been "completely, fully,

14  and fairly litigated," and (4) the prior suit must have resulted in a final judgment on the

15  merits. *Id.* at 965.[4]

16         Defendants argue that the probate court decided three issues which the Cities fully

17  litigated and that are relevant to Plaintiffs' declaratory judgment claims: (1) whether

18  occupancy agreements granted by the fiduciary are superior to all other property interests,

19  (2) whether the Cities must recognize the rights granted under these agreements, and

20  (3) whether the probate court has exclusive jurisdiction over competing claims to trust

21  property.  Doc. 178 at 2-3, 4.  The undisputed facts show that the Cities participated in a

22  July 22, 2010 hearing regarding how the court should handle competing claims to trust

23  property, after which Judge Lindberg allowed participants to file proposed orders and

24  objections.  Doc. 138, ¶¶ 106, 108, 113; *see* Doc. 136 at 41.  The Cities filed an objection

25  to a proposed order on August 6, 2010, and Judge Lindberg issued the court's order on

26  September 7, 2010.  Doc. 136-14 at 18-27; 136-6 at 61-63.  Judge Lindberg's order stated

27

28         [4] The Court applies Utah law to this issue because Defendants claim that issue
    preclusion arises from the Cities' actions in Utah cases.

that "[t]he rights to occupy or use property of the Trust conferred by or through any lease, occupancy agreement or other written permission granted by the Fiduciary shall be considered superior to any other interests in or rights to the use or occupancy of any such property[.]"  Doc. 136-6 at 62.  It also stated that all government officials must recognize and enforce the rights conferred by these agreements, and the probate court has exclusive jurisdiction over competing occupancy claims.  Doc. 136-6 at 62.

Although this evidence shows that the Cities actively asserted their views on issues directly related to their declaratory judgment claims, Defendants' issue preclusion argument fails for the same reason their res judicata argument fails.  The Court is not persuaded that the Cities' ability to "make their views known" in the Probate Action made them parties to or put them in privity with parties to that action.  Defendants rely without analysis on a comment in the Restatement of Judgments that "appearing and participating in an action" makes a person a party.  Doc. 135 at 8, quoting Restatement (2d) of Judgments § 34, cmt a.  They also cite to *Scott v. City of Newport*, 857 A.2d 317, 321-22 (Vt. 2004), in which the Vermont Supreme Court determined that a couple's prior litigation as "interested persons" entitled to appeal zoning decisions rather than as "parties" to the action was not a meaningful distinction for purposes of issue preclusion.  The Vermont court reasoned that the "[p]laintiffs participated in the litigation, had full appeal rights, and actively contested the ownership issue, asserting title to the property in question" and thus effectively satisfied the Restatement's dual requirement that they be "named as a party" and "subjected to the jurisdiction of the court."  *Id.* citing Restatement § 34(1).  Here, however, the Cities' ability to weigh in on discrete issues differs in key respects from the parties' participation in the Vermont court in *Scott*.  Most notably, at the time of the above-referenced hearing, the probate court had already issued a definitive ruling that the Cities were *not* parties to that action.  As a non-party entitled only to apprise the court of its concerns, the Cities had no right to assert their own claims in the Probate Action or to appeal that court's final decisions.  The only time the probate court ruled on a motion from the Cities was when they sought a TRO as "interested persons"

under Utah's probate code, but this was not a final judgment, and it occurred well before the court denied their motion to intervene.  Absent any authority showing that the Cities' permissive appearance as non-parties in hearings and pleadings on relevant issues makes them parties for purposes of issue preclusion under Utah law, the Court is not persuaded that collateral estoppel bars Plaintiffs' declaratory judgment claims.

### C.  Laches.

Laches is an equitable defense that bars claims by a plaintiff who, "'with full knowledge of the facts, acquiesces in a transaction and sleeps upon his rights.'" *Petrella v. Metro-Goldwyn-Mayer, Inc.,* 695 F.3d 946, 951 (9th Cir. 2012) (quoting *Danjaq LLC v. Sony Corp.*, 263 F.3d 942 (9th Cir. 2001)).  Laches will bar a claim when the party asserting it shows the plaintiff unreasonably delayed in filing the action and the delay caused prejudice.  *Id.* at 951-52; *see also Jerger v. Rubin*, 471 P.2d 726, 729 (Ariz. 1970) (laches "is a defense where, because of delay or by lapse of time, the party asserting the defense either is injured (by the mere lapse of time) or changes his position in reliance on the other party's inaction.").[5]

When the Association asserted its constitutional claims concerning the reformation and administration of the Trust in its Petition for Extraordinary Writ before the Utah Supreme Court, that court found that laches barred the Association's claims.  *FLDS v. Lindberg*, 238 P.3d at 1062, 1066.  The court reasoned that the Association had filed its petition more than four years after Mr. Wisan had been appointed special fiduciary and nearly three years after the Trust had been reformed, and that, over the intervening years,

---

[5] Whether the Court follows Utah, Arizona, or federal standards, the outcome is the same.  Like Utah, Arizona applies laches to constitutional claims.  *See, e.g.*, *Mathieu v. Mahoney*, 851 P.2d 81, 85 (Ariz. 1993) ("The doctrine of laches prevents a party from asking this court to decide a difficult question of Arizona constitutional law on the eve of ballot printing when such a question could have been presented much earlier.").  This is consistent with federal standards.  "[A] 'constitutional claim can become time-barred just as any other claim can,'"  *U.S. v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 9 (2008) (quoting *Block v. North Dakota ex rel. Board of Univ. and School Lands*, 461 U.S. 273, 292 (1983)).

Mr. Wisan had reasonably relied on his appointment and the Trust's reformation to make choices and incur obligations on behalf of the Trust that could not be undone. *Id.* at 1064. The court noted that other interested persons, including trust beneficiaries, had also made irreversible decisions in reliance on the validity of court orders that had not been previously challenged or appealed. *Id.* Additionally, the individuals who originally asserted the breach of trust claims that led to the Trust's reformation had settled their claims on the basis of that reformation. *Id.* The court concluded that the Association had not been diligent in challenging the modification of the Trust and that its lack of diligence had resulted in prejudice to numerous parties. *Id.*, *id.* at 1066.

The Utah Supreme Court's finding of prejudice is relevant here, and the finding is further supported by evidence Defendants present. The undisputed facts show that since the Trust's reformation, Mr. Wisan has finalized approximately 704 occupancy agreements, allowing beneficiaries – mostly families with children – to reside in homes on trust property. Doc. 133, ¶¶ 7, 9. Mr. Wisan has also entered into numerous sales and rental or lease transactions involving trust property (*id.*, ¶ 13), all of which would be called into question if Plaintiffs were now permitted to assert their constitutional claim. Thus, absent a finding that Plaintiffs had just cause for delay in bringing this claim, the reasoning of the Utah Supreme Court applies here.

Plaintiffs argue that their delay is justified because they were not aware of the constitutional issues surrounding the reformation of the Trust until the FLDS Association filed its lawsuit in 2008. Doc. 127 at 9; *see FLDS v. Wisan*, 773 F.Supp.2d 1217 (D. Utah, 2011). Plaintiffs also argue that they did not have a distinct interest in resolving the constitutionality of the Reformed Trust until the Cookes filed their civil rights action in 2010. *Id.* Finally, Plaintiffs argue that they did not know until only months ago that a final decision on the merits of the Association's constitutional claims would not be reached in the Association's lawsuit. *Id.* The Court is not persuaded.

Bruce Wisan was appointed as special fiduciary on May 27, 2005, and Judge Lindberg created the Reformed Trust on October 25, 2006. Doc. 16, ¶¶ 26, 34. On

July 15, 2008, when Plaintiffs themselves sought a TRO to remove Mr. Wisan as special fiduciary, Plaintiffs alleged injury from actions taken by Mr. Wisan, including some of the first actions he took in hiring non-citizens of the Cities to work for the Trust. Doc. 136-9 at 6-22; *see id.*, ¶ 11.  Plaintiffs thus have claimed injury from the outset of Mr. Wisan's administration of the trust, and through reasonable diligence could have discovered legal grounds for redressing that injury, including the legal claims they make in this case.  Constitutional law and claims were not hidden from Plaintiffs or any lawyers they might have consulted for redress of their known injuries.  And even if the Court were to credit Plaintiffs' claim that they could not have known of constitutional issues until the FLDS Association filed suit in the Utah Federal District Court on October 26, 2008, that knowledge still predates the filing of this action by more than two years, during which hundreds of land transactions occurred under the reformed trust.

Plaintiffs' argument that they did not have a sufficient interest in challenging the constitutionality of the Trust until the Cookes filed their civil rights lawsuit is unpersuasive and belied by Plaintiffs own actions and the facts on the record.  As previously noted, up to 95 % of the land in the Cities is owned and managed by the Trust, and the majority of the Cities' citizens are members of the FLDS church.  The Cities could hardly have been unaware in 2005 and 2006 that the removal of all former trustees, the appointment of a special fiduciary, and the reformation of the Trust according to secular principles would impact their interests.  Furthermore, as already discussed, Plaintiffs claimed injury to their interests as early as July 15, 2008, including injuries allegedly arising from the virtual beginning of Mr. Wisan's administration, and remained actively involved in proceedings in the probate court and before the Utah Supreme Court up through the time that the Cookes filed their complaint.

Plaintiffs would have the Court believe that their knowledge of injuries from the reformed trust arose only when the Cookes applied for water services, but Plaintiffs' earlier attempts to challenge trust prove otherwise.  Moreover, Plaintiffs attest that "practically every day" they confront competing land claims arising from occupancy

agreements issued under the Reformed Trust that clearly show the relevant "First Amendment implications of Mr. Wisan's actions."  Doc. 127 at 9-10.  Given that Mr. Wisan has entered into more than 700 occupancy agreements since the Trust was reformed, Plaintiffs' assertion that the Cooke litigation gave them a new, unique basis for claiming injury is highly implausible.  Even if Plaintiffs had not previously confronted the precise injury that allegedly arose from Mr. Wisan's grant of occupancy rights to the Cookes, the Cities' active participation in prior litigation, including their opposition to the sale of the Berry Knoll property and their Petition for Extraordinary Writ to the Utah Supreme Court, shows that at least by 2008 and 2009 Plaintiffs had sufficient bases for making the constitutional claim they waited until 2011 to assert.[6]

The fact that the Association's constitutional claims remained pending before the Tenth Circuit and were not finally denied until November 5, 2012, does not excuse Plaintiffs' delay in bringing this action.  At most, this shows that Plaintiffs sat on the sidelines with regard to these claims, awaiting the outcome of the Association's actions to resolve an issue of significant impact to their own interests.  Plaintiffs acknowledge as much, stating that they have always been candid with the courts about their inability to make the constitutional arguments made by the Association, and that for this reason joining the Association's suit would have been "contradictory [for them], if not impossible."  Doc. 171 at 4.  To the extent that Plaintiffs elected not to assert any claims regarding the constitutionality of the Trust because they relied on the Association to do so, Plaintiffs cannot now assert just cause for delay simply because the Association's claims failed.  Allowing claimants to wait for other litigants to exhaust their claims would defeat the purpose of laches – to ensure that those with potential claims do not "sleep on their rights" to the detriment of individuals prejudiced by their delay.  As the Utah

---

[6] Plaintiffs waited nine months after the Cookes filed their civil rights complaint to bring this declaratory judgment action.  And they filed this action shortly after Judge Benson granted a preliminary injunction against the reformation of the Trust on February 24, 2011, suggesting that this action was prompted more by a desire to take advantage of that ruling than by any newly-discovered cause of action.

Supreme Court found, many actions taken in reliance on the Reformed Trust simply cannot be undone without causing extreme prejudice to trust beneficiaries and others.

For these reasons, the Court finds that laches bars Plaintiffs from asserting their first claim for relief. Plaintiffs waited years to assert that claim, during which hundreds of property transactions were completed in reliance on the validity of the reformed trust and Mr. Wisan's actions.[7]

### D.   Plaintiffs' Supplemental Arguments.

Plaintiffs have submitted a notice of supplemental authority from American Jurisprudence ("Am. Jur.") suggesting that laches does not apply against municipalities. Doc. 184. Am. Jur. cites cases for the following propositions: (1) "Generally, waiver, estoppel, and laches are not favored when sought to be applied against public entities[,] (2) "The defenses of estoppel, ratification, acquiescence, or laches cannot be invoked against a governmental agency to prevent it from discharging its statutory duties[,] and (3) "Laches can be imputed only to a municipality acting in its private or proprietary capacity and not when it is protecting a public interest." 56 Am. Jur. 2d *Municipal Corporations, Etc.* § 738.

In support of the first proposition, Am. Jur. cites *County of Morris v. Fauver*, 685 A.2d 1342, (N.J. App. 1996), *judgment aff'd in part, rev'd in part on other grounds*, 707 A.2d 958 (New Jersey 1998). In *Fauver*, the New Jersey Court of Appeals declined to apply waiver, estoppel, and laches to a county's suit against the state for breach of contract where the state had failed for a number of years to reimburse the county for housing prisoners. 685 A.2d at 1346-47. In refusing to apply any equitable defenses, the court cited without elaboration to other New Jersey cases for the propositions that contracts between government entities must not lightly be set aside, and "waiver, estoppel, and laches are not favored when sought to be applied against public entities." 685 A.2d at 1350-51. The cases upon which *Fauver* relied, *O'Malley v. Dep't of Energy,*

---

[7] Given this conclusion, the Court need not address Defendants' judicial estoppel defense. Doc. 135 at 10.

537 A.2d 647 (N.J. 1987), and *Township of Fairfield v. Likanchuk's, Inc.,* 644 A.2d 120 (N.J. App. 1994), dealt, respectively, with a plaintiff's attempt to invoke equitable estoppel against a public entity for its allegedly wrongful employment actions, and a plaintiff's attempt to invoke equitable estoppel and laches against a township's attempt to enforce its zoning laws. *O'Malley* found that unless required to prevent "manifest injustice," equitable estoppel should rarely be invoked where it would interfere with "essential government functions" (537 A.2d at 650-51) (internal citations omitted), and *Township of Fairfield* found on the basis of a New Jersey Supreme Court decision that equitable estoppel and laches did not apply to violations of a zoning ordinance. 644 A.2d at 126 (citing *Hilton Acres v. Klein,* 174 A.2d 465 (1961). None of these New Jersey cases apply where, as here, there is no contract dispute between government entities and no question of the Cities' ability to make its own employment decisions or enforce its own laws.

The second and third propositions – that laches and other equitable doctrines do not apply against municipalities to prevent them from discharging statutory duties or from acting to protect the public interest – both rely on New York cases dealing with a state's or a municipality's attempts to enforce statutory provisions. *See A.C. Transp., Inc. v. Board of Educ. of City of New York*, 687 N.Y.S.2d 1, (N.Y. App. Div. 1999) (State Education Department not barred by estoppel or laches from recouping an erroneous overpayment of statutorily-determined funds to the Board of Education because such defenses "'cannot be invoked against a governmental agency to prevent it from discharging its statutory duties'") (quoting *Matter of New York State Medical Transp. v. Perales,* 77 N.Y.2d 126, 130 (N.Y. 1990)); *Fowler v. City of Saratoga Springs*, 626 N.Y.S.2d 306, 307 (N.Y. App. Div. 1995) (City not barred by laches from enforcing a statutory licensing requirement against a City Engineer). *Fowler* stated more expansively, on the basis of *Carney v. Newburgh Park Motors*, 444 N.Y.S.2d 220 (N.Y. App. Div. 1981), and *Matter of Cortlandt Nursing Home v. Axelrod,* 495 N.Y.S.2d 927 (N.Y 1985), that "laches can only be imputed to a municipality acting in its private or

proprietary capacity . . . and not when it is protecting a public interest."  626 N.Y.S.2d at 307.  *Carney* found that laches could be invoked against a state's insurance carrier because "in matters of litigation it is considered to be an entity separate from the State itself."  444 N.Y.S.2d. at 221.  *Cortlandt* found that laches did not apply to a state's attempt to recoup Medicaid overpayments where it was acting to protect a public right or interest.  495 N.Y.S.2d at 932, n. 2.

The Court is not persuaded by these cases that applying laches to Plaintiffs' constitutional claim is error.  Although Plaintiffs are not acting in a private capacity as was the insurance carrier in *Carney*, neither are they acting to discharge a statutory duty or to enforce an overlooked or misapplied statutory provision as the plaintiffs were in  the remaining cases.  Plaintiffs may claim they are acting in the public interest because they are seeking to avoid the cost of extending water services to the Cookes' property, but the hundreds of transactions approved by Mr. Wisan over the last seven years, virtually all of which involve property in the Cities, surely have impacted the Cities' finances.  The Court cannot accept the notion that a municipality is free from the restraint of laches no matter how long it waits to redress a known and ongoing public injury.  Once the trust was reformed and operating, it was clearly foreseeable to the Cities that the trust's operation would affect them financially – the trust owns 95% of the property in the cities.  Given this certainty, and the fact that the Cities have claimed to have been injured virtually from the start of Mr. Wisan's administration, the Cities cannot claim a right to highly prejudicial delay merely because the trust's operation affects the public fiscally.  Additionally, challenging the constitutionality of all trust land transactions since 2006 in order to avoid a single municipal obligation that would not otherwise arise cannot be said to relate to the protection of the public interest where, as Plaintiffs acknowledge in their complaints, they could be obligated to provide services to any rightful claimant to the Property or to other land administered by the Reformed Trust.  More importantly, calling into question all of the trust's prior land transactions would prejudice literally hundreds of individuals.

In sum, Plaintiffs notice of supplemental authority does not change the Court's finding that laches applies to their first claim for relief. Moreover, this authority cites only to New Jersey and New York state law, not to laches limitations in Arizona or Utah, and the court finds no authority from these jurisdictions that compels a different outcome. The Court will grant summary judgment to Defendants on the constitutional claim.

## IV.    Rights to the Property.

Plaintiffs seek a declaratory judgment as to whether the Cookes or Robert Black have a superior claim to the Property. The Cookes' purported property rights stem from a 2008 occupancy agreement with Mr. Wisan, and Mr. Black's stems from a 1999 oral agreement with the UEP Trust prior to its reformation. Docs. 16, ¶ 115; 121, ¶ 120.[8] Plaintiffs argue that both the Cookes and Mr. Black have asserted rights to the Property and City entities are "caught in the middle" and cannot determine what obligations they owe to either claimant. Doc. 125 at 15-17.

### A.    Robert Black's Claim.

The undisputed facts show that in 1999, when Mr. Black was 20 or 21 years old, he expressed an interest to Bishop Fred Jessop in having UEP Trust property assigned to him. Doc. 132, ¶¶ 44-45. Mr. Black was then permitted, following the approval of FLDS Prophet Rulon Jeffs, to participate in a drawing by which the Property was ultimately "entrusted" to him. Docs. 126, ¶ 50; 132, ¶¶ 45-47; *see* Doc. 126-2, Dep. of Robert Black, Aug. 26, 2011, at 28-31. In late 1999 or 2000, Mr. Black cleared the land, poured a foundation, and framed a house. Doc. 126, ¶¶ 52-53; Doc 126-2 at 32, 53. He received a building permit in 2001, but ceased working on the Property in 2002. Doc. 126, ¶ 52, 56; Doc. 126-2 at 53. While working on the Property, Mr. Black lived with his parents in Colorado City, but he moved away from the community in late 2002

---

[8] Colorado City additionally argues in its motion for summary judgment that the Court should declare that the UEP Trust must follow a two-step process for all competing claims to trust property in Colorado City to determine (1) who has rights to the property under Arizona law, and (2), who has the superior right for purposes of Colorado City's obligations. Doc. 125 at 10-15. The Court will confine its discussion to the relief requested in the complaint.

1   or early 2003.  Doc. 183-1 at 36-37.  Mr. Black subsequently moved four or five times

2   within Utah, but did not return to Colorado City.  *Id.*  In September 2009, Mr. Black told

3   the Colorado City Utility Board that he intended to finish building a house on the

4   Property, and he submitted an application for a new building permit.  Doc. 126-2 at 55-

5   56; 66.

6          Defendants argue that these facts do not show that Mr. Black has a current right to

7   the Property because (1) the 1999 oral agreement was made under the authority of the

8   Amended and Restated Declaration of Trust which states that the use of trust property

9   does not in any way become a right or a claim from the Trust; (2) Arizona's statute of

10  frauds requires a writing, and (3) even if Mr. Black did obtain occupancy rights to the

11  Property in 1999, he lost them through abandonment.  Doc. 130 at 3-9.  The Court agrees.

12                 **1.      The Amended and Restated Declaration of Trust.**

13         As previously noted, the UEP Trust was amended in 1998 to comply with the Utah

14  Supreme Court's ruling in *Jeffs v. Stubbs*, 970 P.2d 1234 (Utah 1998).  On November 3,

15  1998, the trustees signed and recorded the Amended and Restated Declaration of Trust of

16  the United Effort Plan Trust ("the Declaration").  *See* Doc. 126-1 at 2-8.  The Declaration

17  states that it supersedes all previous Trust documents.  *Id.* at 2.  It further states that the

18  privilege to live on and use trust lands is granted and may be revoked by the trustees and

19  that the "use of property owned by the United Effort Plan Trust is not and does not

20  become a right or claim of anyone who may benefit in any way from the Trust."  *Id.* at 4.

21         Plaintiffs argue that it is not clear that this limitation applies to Mr. Black's rights

22  because he engaged in conversations about his interest in trust property in mid-1998,

23  before the Declaration existed; he was not told about the Declaration, but was, instead,

24  told by Bishop Jessop that the Property would be entrusted to him until he died; and there

25  is no evidence that the Prophet or the Bishops did not have the authority to assign trust

26  property under terms different from those in the Declaration.  Doc. 149 at 8-9.  The Court

27  finds these arguments unpersuasive.

28         The undisputed evidence from Mr. Black's deposition shows that he obtained his

rights to the Property in 1999, at which time the terms of the November 3, 1998 Declaration governed all trust transactions and expressly superseded all previous trust documents.  Docs. 126-1 at 4; 126-2 at 28.  Plaintiffs base their assertion that Mr. Black's property interests date from 1998 on a declaration, made on February 28, 2012, in which Mr. Black states that he began having conversations with Prophet Rulon Jeffs about acquiring trust property in early to mid-1998 and was granted the Property at a meeting in late 1998 or early 1999.  Doc. 150-1, ¶¶ 5, 7-8.  The Ninth Circuit holds, however, that "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."  *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991).  Mr. Black's declaration, submitted after the close of discovery, does not create a genuine issue of fact that he obtained rights to the Property prior to the effective date of the Declaration.  At most, Mr. Black's statements lack clarity about when he received his entrustment and are, nonetheless, in clear conflict with his earlier testimony.  *See Radobenko v. Automated Equipment. Corp.*, 520 F.2s 540, 544 (9th Cir. 1975) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.") (internal quotation marks, citation omitted).

Whether or not Mr. Black knew of the Declaration when he obtained rights to use the Property is also not a reason for finding that the duly recorded Declaration does not apply.  *See* A.R.S. § 33-416; V*illas at Hidden Lakes Condominiums Ass'n. v. Geupel Constr. Co.*, 847 P.2d 117, 121-22 (Ariz. App. 1993) ("Under Arizona law, a recorded document stating its terms and purpose imparts constructive notice.").  Plaintiffs rely on a statement of Mr. Black, also in the February 28, 2012 Declaration, that Bishop Jessop told him the Property would be entrusted to him until he died, and claim that this statement trumps the terms of the Declaration.  Doc. 149 at 9; *see* Doc. 150-1, ¶ 10. Plaintiffs cite to *Cadlerock Props. Joint Venture, L.P. v. Town of Ashford*, 909 A.2d 964, 968 (Conn. App. 2006), as holding that actual notice is superior to constructive notice.

But *Cadlerock* only shows that where notice is required, actual notice of the applicable terms is adequate, not, as Plaintiffs appear to argue, that any contrary statements made by persons conveying property effectively override the terms in recorded documents that govern such transactions.  *Id.*  A person dealing with a trustee is also on inquiry notice regarding the extent of the trustee's powers and charged with knowledge of the facts which a reasonable investigation would disclose.  *3502 Lending, LLC v. CTC Real Estate Service*, 229 P.3d 1016, 1019 (Ariz. App. 2010); Bogert, The Law of Trusts and Trustees, § 565 (2012).

Plaintiffs' assertion that there is no evidence that the trustees did not have the authority to convey property apart from the terms of the Declaration is also without merit. The Declaration unequivocally states that use of trust property "does not become a right or claim of anyone who may benefit in any way from the Trust."  Doc. 126-1 at 2-8. Bishop Jessop and Prophet Jeffs were among the trustees and signatories to the Declaration at the time it was recorded.  *Id.* at 5-6.  Plaintiffs have not pointed to any authority upon which a reasonable jury could conclude that Mr. Black's purported property interest was exempt from the stated terms of that Declaration.

Plaintiffs cite to *United Effort Plan Trust v. Holm*, 10 P.3d, 641 (Ariz. App. 2004), and *Jeffs v. Stubbs*, 970 P.2d 1234, in which occupants of trust property claimed to have life estates, as showing that Mr. Black may be entitled to the same.  Doc. 125 at 11-13. Neither case applies here.  In *Holm*, the UEP Trust brought a forcible detainer action against Holm, claiming that he had violated the terms of a tenancy at will because he no longer lived in compliance with the principles of the FLDS church, and Holm argued that he could not be evicted from the property because he had a life estate.  10 P.3d at 645. The trial court dismissed the forcible detainer action, finding that Holm was entitled either to a life estate or just compensation for his improvements to the property.  *Id.* at 644.  The Arizona Court of Appeals affirmed, but did so on the grounds that whether Holm had a tenancy at will or a life estate could not be resolved on the basis of a forcible-detainer action.  *Id.* at 645.  It did not find, as Plaintiffs imply, that a verbal agreement

was sufficient to create a life estate in trust property.

*Jeffs* similarly dealt with whether claimants had obtained an ownership interest in trust property, but it based its analysis on the Utah Occupying Claimants Act which stated that persons could assert an equitable interest absent title to trust property if they had "color of title," meaning they had occupied the property for five years, or for less time, but had made improvements, and they had a "good faith belief of ownership."  970 P.2d at 1242-43.  The trial court interpreted "ownership" to mean a fee simple interest in the property.  *Id.* at 1242.  The Utah Supreme Court found this interpretation too narrow, and remanded for the trial court to determine whether any Utah claimants had a good faith belief that they were entitled to life estates.  *Id.*  Significantly, the court found that the Utah Occupying Claimants Act did not apply to Arizona claimants, and it remanded as to these claimants for a determination of whether they had been granted proper equitable remedies under Arizona law.  *Id.*  Neither *Holm* nor *Jeffs* held that claimants were entitled to life estates on trust land under Arizona law, and neither case supports the finding of a life estate where Mr. Black never lived on the Property and where his receipt of the Property and any improvements he made to it occurred when the terms of the Declaration disclaimed any entitlement to a right or claim to trust property.

### 2.    Statute of Frauds.

Even if, as Plaintiffs argue, the Declaration was not in effect at the time the UEP Trust "entrusted" the Property to Mr. Black, Arizona's statute of frauds precludes Mr. Black from now making a legal claim to the Property, more than twelve years after the verbal agreement was made.  Arizona's statute of frauds states that "[n]o action shall be brought in any court in the following cases unless the promise or agreement upon which the action is brought, or some memorandum thereof, is in writing and signed by the party to be charged, or by some person by him thereunto lawfully authorized[.]"  Ariz. Rev. S. § 44-101.  It further specifies that "an agreement for leasing for a longer period than one year, or for the sale of real property or an interest therein . . . if made by an agent of the party sought to be charged, is invalid unless the authority of the agent is in writing,

subscribed by the party sought to be charged." *Id.* at § 44-101(6); *see also id.* at § 33-401(A) ("No estate of inheritance, freehold, or for a term of more than one year, in lands or tenements, shall be conveyed unless the conveyance is by an instrument in writing, subscribed and delivered by the party disposing of the estate, or by his agent thereunto authorized by writing.").

The Arizona Supreme Court held in *Custis v. Valley Nat. Bank of Phoenix*, 375 P.2d 558, 561 (Ariz. 1962), that a memorandum sufficient to satisfy the statute of frauds could be an informal writing, but must "state with reasonable certainty the subject matter to which the contract relates and the terms and conditions of all of the promises constituting the contract." For the sale of real property, this includes the identity of buyer and seller, the price and terms for payment, and a description of the property to be transferred. *Id.* For the lease of real property, the essentials include "the identification of the property to be leased, *the term of the lease*, and the rental agreed upon." *Id.* (emphasis in original). Although, as Plaintiffs argue, the right to occupy a property under the UEP Trust does not constitute either a sale or a lease, per se (Doc. 149 at 10), the statute of frauds applies to any interest in land for more than one year. Ariz. Rev. S. §§ 44-101(6), 33-401(A). Absent any writing attesting to Mr. Black's occupancy interest in or description of the Property "entrusted" to him by oral agreement in 1999, Mr. Black has no remaining legally cognizable contract rights stemming from that agreement under Arizona law.

Plaintiffs argue that Mr. Black's interest in the Property is exempt from the statute of frauds because his work on the Property constitutes partial performance. Doc. 149 at 10. But acts of partial performance take a contract outside the statute of frauds "only if they cannot be explained in the absence of the contract." *Owens v. M.E. Schepp Ltd. P'ship*, 182 P.3d 664, 668 (Ariz. 2008); *see also William Henry Brophy College v. Tovar*, 619 P.2d 19, 23 (Ariz. App. 1980) ("the part performance alleged must be unequivocally referable solely to the oral contract."). The undisputed facts show that Mr. Black began construction of a house on the Property in late 1999 after the Declaration was in effect.

Under the terms of the Declaration, "[i]mprovements made by persons living on the United Effort Plan Trust Property become the property of the Trust and are consecrations to the Trust." Doc. 136-2 at 19. Thus, it cannot be said that Mr. Black's partial construction of a house is "unequivocally referable" to an agreement that he retain an ownership or occupancy interest in either the Property or his improvements. Under the terms of the Declaration, his improvements could be entirely consistent with a non-permanent right to occupy the Property and his consecration of the improvements to the Trust. Such improvements would not be "inconsistent with other explanations, or an existing relationship between the parties." *Owens*, 182 P.3d at 669.

To the extent that Mr. Black may attempt to assert an unjust enrichment claim against the Trust for his work and financial investments in the Property, this belies the above-stated terms of the Declaration because to make such a claim, a plaintiff must show that it was not intended or expected that the benefit obtained be conferred gratuitously. *Arnold & Assocs., Inc. v. Misys Healthcare Sys.*, 275 F.Supp 2d 1013, 1025 (D. Ariz. 2003). Moreover, a valid unjust enrichment claim would only entitle Mr. Black to just compensation for his improvements, not to an ongoing occupancy or ownership interest in the Property. *Id.* at 1024-25. Under the facts presented in this case, neither the oral occupancy agreement made in 1999 nor the subsequent work Mr. Black performed entitles him to an ongoing interest in the Property.

### 3. Abandonment.

Defendants argue that Mr. Black relinquished any rights that may have been conferred due to abandonment. Doc. 130 at 7-9. Plaintiffs cite *Riggs v. Murdoch*, 458 P.2d 115, 117-118 (Ariz. App. 1969), which addressed whether a tenant had abandoned and a landlord unequivocally retaken a leased premises for purposes of "surrender by operation of law." The court determined that questions of abandonment and unequivocal retaking are questions of fact that depend on the surrounding circumstances. *Id.* at 118.

Defendants point to evidence, disputed by Plaintiffs, that Mr. Black disclaimed any interest in the Property on multiple occasions prior to and after Mr. Wisan's

assignment of the Property to the Cookes, including statements he made to Jethro
Barlow, an agent of the UEP Trust, from August 2005 to May 2006 and again in early
2008, in which he stated he had no intention of returning to or continuing to work on the
Property.  Doc. 132, ¶¶ 60-70; *see* Doc. 150, ¶¶ 60-70 (disputing statements).  Plaintiffs
cite to evidence from Mr. Black's deposition and declaration that he continued to express
an interest in the Property and left his brother in charge of it and asked him to continue
working on it after he left Colorado City in late 2002 or early 2003.  Doc. 149 at 10-11;
*see* Doc. 150, ¶¶ 114-120.  Plaintiffs also point to Mr. Black's conduct in expressing his
entitlement to the Property at a Town Council meeting in September 2009, and applying
for a second building permit in October 2009, as evidence that he did not abandon the
Property.  Doc. 125 at 16.  Although this evidence raises a question of fact about Mr.
Black's intent, the record contains no evidence that Mr. Black ever occupied the
Property, that he or anyone else worked on the Property on his behalf after 2002, or that
Mr. Black made any attempt to reassert his interest in the Property from the time he left
Colorado City in 2002 or early 2003 until he attended the Town Council meeting in 2009,
more six years later.  The record also contains no evidence that Mr. Black ever attempted
to assert a legal claim to the Property since applying for a second building permit.  The
six year gap between Mr. Black's last activity on the Property and his assertion of an
interest at the Town Council meeting, and his failure to take any action to adjudicate his
asserted rights even after the Property was granted to the Cookes, present sufficient facts,
taken as a whole, to show abandonment.  Moreover, even without a finding of
abandonment sufficient to establish "surrender by operation of law," Mr. Black is barred
by laches from now asserting a claim that the Cookes are in illegal possession of the
Property when the facts show that the Cookes entered into an occupancy agreement for
the Property in February 2008 (Doc. 126, ¶ 39), and Mr. Black's own testimony shows
that he discovered them on the Property at least by 2010.  Doc. 150-1, ¶ 37.  Mr. Black
has abandoned any interest he has in the Property.

1

**B.     The Cookes' Claim.**

2     The undisputed facts show that on February 11, 2008, Ronald Cooke entered into

3  a residential occupancy agreement for the Property with Bruce Wisan, fiduciary of the

4  UEP Trust.   Doc. 126, ¶ 39; *see* United Effort Plan Trust Residential Occupancy

5  Agreement, Doc. 126-1 at 207-208.   Mr. Wisan entered into this agreement with

6  knowledge that Mr. Black had made the original improvements to the Property, including

7  the unfinished house.   Doc. 126, ¶ 40.   The Cookes claim to have subsequently made

8  significant improvements to the house to make it livable.   Docs. 132, ¶ 88; 150 ¶ 88.

9     Plaintiffs assert only two reasons – already addressed – for questioning the validity

10  of the Cookes' February 2008 occupancy agreement: (1) Mr. Wisan lacked authority to

11  approve this agreement because his appointment as special fiduciary and the reformation

12  of the Trust were unconstitutional, and (2) Mr. Black may have a superior claim.   *See,*

13  *e.g.* Doc. 16, ¶¶ 107-110; 114.   Neither of these reasons is sufficient for finding the

14  Cookes' occupancy agreement invalid.   The Court has found that laches applies to

15  Plaintiffs' constitutional claim, and has found no evidence from which to conclude that

16  Mr. Black has any remaining, legally cognizable rights to the Property.   Absent any other

17  facts from which to conclude that the Cookes' undisputed occupancy agreement is invalid

18  or no longer in effect, the Cookes have established a valid interest in the Property.

19  **V.     Additional Matters.**

20     The Arizona Attorney General filed a request for judicial notice in support of his

21  motion for summary judgment, requesting that the Court take judicial notice pursuant to

22  Federal Rule of Civil Procedure 201 of a number of documents that were filed in state

23  and federal courts in relation to the Trust ligation that he submitted as attachments to his

24  statement of facts.   Doc. 137.   Colorado City filed an objection, asking the Court to take

25  judicial notice only of the existence of the documents and not of the facts contained in

26  each document.   Doc. 142.   The Court will grant the Arizona Attorney General's request

27  for the limited purpose of documenting as an undisputed matter of public record the

28  existence of and participation of the parties in prior UEP Trust litigation.   *See* Doc. 137 at

1-2; *Harris v. County of Orange*, 682 F3d 1126, 1132 (9th Cir. 2012).

Hildale filed, and Colorado City joined, a motion to strike the joint supplemental statement of facts of Defendants (Doc. 175) and Exhibit B to the Utah Attorney General's reply in support of his motion for summary judgment (Doc. 177-2), on the basis that Arizona Local Rule 56.1(a) does not permit supplemental facts and new evidence to be submitted with a reply that do not relate to specific paragraphs in the statement of facts. Docs. 175 at 2, 182.   The Court has not referenced or relied upon the supplemental statement of facts or Exhibit B in its analysis, and therefore will deny Plaintiffs' motion as moot.

**IT IS ORDERED:**

1.   Plaintiff's and Plaintiff-Intervenors' motions for summary judgment (Docs. 125, 127) are **denied in part**, and Defendants' and Defendant-Intervenors' separate motions for summary judgment (Docs. 130, 131; 129, 135) are **granted in part** with respect to the first count in Plaintiff's and Plaintiff-Intervenors' complaints.

2.   Plaintiff's and Plaintiff-Intervenors' motions for summary judgment (Docs. 125, 127) are **granted in part**, and Defendants' and Defendant-Intervenors' separate motions for summary judgment (Docs. 130, 131; 129, 135) are **denied in part,** with respect to the second count in Plaintiff's and Plaintiff-Intervenors' complaints as set forth in this order.

3.   Defendant-Intervenor Arizona Attorney General's request for judicial notice (Doc. 137) is **granted**.

4.   Defendants Hildale's and Colorado City's motion to strike (Doc. 180) is **denied as moot**.

5.   The Clerk of the Court is directed to **terminate** this action.

Dated this 8th day of May, 2013.

_David G. Campbell_

_____
David G. Campbell
United States District Judge